## TEXACO, INC., ET AL. *v.* SHORT ET AL.

No. 80–965.  Argued October 6, 1981—Decided January 12, 1982*

---

*Together with No. 80–1018, *Pond et al.* v. *Walden et al.*, also on appeal from the same court.

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which WHITE, MARSHALL, and POWELL, JJ., joined, *post*, p. 540.

*John L. Carroll* argued the cause for appellants in both cases and filed briefs for appellants in No. 80–965. *James M. Buthod* and *Mark W. Rietman* filed briefs for appellants in No. 80–1018.

*Verner P. Partenheimer* argued the cause for appellees in both cases. With him on the brief were *Ronald W. Polston, Linley E. Pearson, Jack R. O'Neill,* and *Charles R. Nixon.*†

JUSTICE STEVENS delivered the opinion of the Court.

In 1971 the Indiana Legislature enacted a statute providing that a severed mineral interest that is not used for a period of 20 years automatically lapses and reverts to the current surface owner of the property, unless the mineral owner files a statement of claim in the local county recorder's office.[1] The Indiana Supreme Court rejected a challenge to the constitutionality of the statute. —— Ind. ——, 406 N. E. 2d 625 (1980). We noted probable jurisdiction, 450 U. S. 993, and now affirm.

As the Indiana Supreme Court explained, the Mineral Lapse Act "puts an end to interests in coal, oil, gas or other minerals which have not been used for twenty years."[2] The statute provides that the unused interest shall be "extinguished" and that its "ownership shall revert to the then owner of the interest out of which it was carved."[3] The statute, which became effective on September 2, 1971, contained a 2-year grace period in which owners of mineral interests

---

†*John M. Rosenberg* filed a brief for Save our Cumberland Mountains, Inc., et al., as *amici curiae* urging affirmance.

[1] The statute is entitled the Dormant Mineral Interests Act, and is more commonly known as the Mineral Lapse Act. Ind. Code §§ 32–5–11–1 through 32–5–11–8 (1976), as added by 1971 Ind. Acts, Pub. L. 423, § 1.

[2] —— Ind., at ——, 406 N. E. 2d, at 627.

[3] "Any interest in coal, oil and gas, and other minerals, shall, if unused for a period of 20 years, be extinguished, unless a statement of claim is filed in accordance with section five hereof *[sic]*, and the ownership shall revert to the then owner of the interest out of which it was carved." Ind. Code § 32–5–11–1 (1976).

that were then unused and subject to lapse could preserve those interests by filing a claim in the recorder's office.[4]

The "use" of a mineral interest[5] that is sufficient to preclude its extinction includes the actual or attempted production of minerals, the payment of rents or royalties, and any payment of taxes;[6] a mineral owner may also protect his interest by filing a statement of claim with the local recorder of deeds.[7]  The statute contains one exception to this general

---

[4] See n. 7, *infra.*

[5] As defined by the Act: "A mineral interest shall be taken to mean the interest which is created by an instrument transferring, either by grant, assignment, or reservation, or otherwise an interest, of any kind, in coal, oil and gas, and other minerals."  Ind. Code § 32–5–11–2 (1976).  The Indiana Supreme Court described the nature of this interest as follows:

"Interests or estates in oil, gas, coal and other minerals lying beneath the surface of the land are interests in real. estate for our purposes here, and as such are entitled beyond question to the firmest protection of the Constitution from irrational state action.  They are vested property interests separate and distinct from the surface ownership.  The State has no power to deprive an owner of such an interest without due process of law.  They are entitled to the same protection as are fee simple titles.  They are themselves of great utility and benefit to the society as a means of facilitating the development of natural resources." —— Ind., at ——, 406 N. E. 2d, at 627.

[6] "A mineral interest shall be deemed to be used when there are any minerals produced thereunder or when operations are being conducted thereon for injection, withdrawal, storage or disposal of water, gas or other fluid substances, or when rentals or royalties are being paid by the owner thereof for the purpose of delaying or enjoying the use or exercise of such rights or when any such use is being carried out on any tract with which such mineral interest may be unitized or pooled for production purposes, or when, in the case of coal or other solid minerals, there is production from a common vein or seam by the owners of such mineral interests, or when taxes are paid on such mineral interest by the owner thereof.  Any use pursuant to or authorized by the instrument creating such mineral interest shall be effective to continue in force all rights granted by such instrument."  Ind. Code § 32–5–11–3 (1976).

[7] "The statement of claim provided in section one above shall be filed by the owner of the mineral interest prior to the end of the twenty year period set forth in section two [*sic*] or within two years after the effective date of this act, whichever is later, and shall contain the name and address of the

rule: if an owner of 10 or more interests in the same county files a statement of claim that inadvertently omits some of those interests, the omitted interests may be preserved by a supplemental filing made within 60 days of receiving actual notice of the lapse.[8]

The statute does not require that any specific notice be given to a mineral owner prior to a statutory lapse of a mineral estate. The Act does set forth a procedure, however, by which a surface owner who has succeeded to the ownership of a mineral estate pursuant to the statute may give notice that the mineral interest has lapsed.[9]

----

owner of such interest, and description of the land, on or under which such mineral interest is located. Such statement of claim shall be filed in the office of the Recorder of Deeds in the county in which such land is located. Upon the filing of the statement of claim within the time provided, it shall be deemed that such mineral interest was being used on the date the statement of claim was filed." Ind. Code § 32–5–11–4 (1976).

[8] "Failure to file a statement of claim within the time provided in section 4 shall not cause a mineral interest to be extinguished if the owner of such mineral interest:

"1) was at the time of the expiration of the period provided in section four, the owner of ten or more mineral interests, as above defined, in the county in which such mineral interest is located, and;

"2) made diligent effort to preserve all of such interests as were not being used, and did within a period of ten years prior to the expiration of the period provided in section 4 preserve other mineral interests, in said county, by the filing of statements of claim as herein required, and;

"3) failed to preserve such interest through inadvertence, and;

"4) filed the statement of claim herein required, within sixty (60) days after publication of notice as provided in section seven herein [sic], if such notice is published, and if no such notice is published, within sixty (60) days after receiving actual knowledge that such mineral interest had lapsed." Ind. Code § 32–5–11–5 (1976).

[9] "Any person who will succeed to the ownership of any mineral interest, upon the lapse thereof, may give notice of the lapse of such mineral interest by publishing the same in a newspaper of general circulation in the county in which such mineral interest is located, and, if the address of such mineral interest owner is shown of record or can be determined upon reasonable inquiry, by mailing within ten days after such publication a copy of such notice to the owner of such mineral interest. The notice shall state

Two cases are consolidated in this appeal. The facts in each are stipulated. In No. 80–965, appellants include 11 parties who claim ownership of fractional mineral interests severed in 1942 and in 1944 from a 132-acre tract of land in Gibson County, Ind.; a 12th appellant is the lessee of oil and gas leases executed in 1976 and 1977 by the other appellants. The appellee is the surface owner of the 132-acre tract from which the appellants' mineral interests were carved. The parties stipulated that the appellants had not used the mineral interests for 20 years and had not filed a statement of claim within 2 years of the effective date of the statute. Thus, under the terms of the Dormant Mineral Interests Act, the mineral interests automatically lapsed on September 2, 1973, when the 2-year grace period expired. On April 28, 1977, appellee gave notice that the mineral interests had lapsed.[10] Appellants responded by filing statements of claim in the Office of the Recorder of Gibson County. Thereafter, appellee filed this action, seeking a declaratory judgment that the rights of the mineral interest owners had lapsed and were extinguished by reason of the Dormant Mineral Interests Act.

In No. 80–1018, the severed mineral estate was created on March 1, 1954. On that date, appellants Pond and Bobe conveyed land to appellees by a warranty deed that contained a reservation of the mineral estate. On June 17, 1976, Pond and Bobe executed a coal mining lease with appellant Consolidated Coal Co. The parties stipulated that, for a 20-year

---

the name of the owner of such mineral interest, as shown of record, a description of the land, and the name of the person giving such notice. If a copy of such notice, together with an affidavit of service thereof, shall be promptly filed in the office of the Recorder of Deeds in the county wherein such land is located, the record thereof shall be prima facie evidence, in any legal proceedings, that such notice was given." Ind. Code § 32–5–11–6 (1976).

[10] Appellee published a "notice of lapse of mineral interest" in the Star Echo, a newspaper published at Owensville, Ind. On May 6, 1977, appellee mailed a similar notice to each of the appellants, except the oil and gas lessee.

period following the creation of the mineral estate, appellants did not use the interest or file a statement of claim in the Recorder's Office. Thus, on March 1, 1974, a date more than two years after the effective date of the Dormant Mineral Interests Act, a statutory lapse occurred. On March 4, 1977, appellees gave notice of the lapse, both by letter to the appellants and by publication in the Princeton Daily Clarion. The parties jointly filed the instant lawsuit on January 12, 1978, to resolve their conflicting claims to the mineral rights.

In each case it is agreed that if the statute is valid, appellants' mineral interests have lapsed because of their failure to produce minerals, pay taxes, or file a statement of claim within the statutory period. In neither case does the agreed statement of facts indicate whether any of the appellants was aware of the enactment of the Mineral Lapse Act, or of its possible effect on his mineral interests, at any time after the enactment of the statute and before the appellees published notice of the lapse of the mineral estates.

At all stages of the proceedings, appellants challenged the constitutionality of the Dormant Mineral Interests Act. Appellants claimed that the lack of prior notice of the lapse of their mineral rights deprived them of property without due process of law, that the statute effected a taking of private property for public use without just compensation, and that the exception contained in the Act for owners of 10 or more mineral interests denied them the equal protection of the law; appellants based these arguments on the Fourteenth Amendment of the United States Constitution.[11]  Appellants also

---

[11] The Fourteenth Amendment provides in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Fifth Amendment prohibition against the taking of private property for public use without just compensation applies against the States through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 160.

contended that the statute constituted an impairment of contracts in violation of Art. I, § 10, of the Constitution.[12] The state trial court held that the statute deprived appellants of property without due process of law, and effected a taking of property without just compensation.[13]

On appeal, the Indiana Supreme Court reversed. The court first explained the purpose of the Mineral Lapse Act:

> "The Act reflects the legislative belief that the existence of a mineral interest about which there has been no display of activity or interest by the owners thereof for a period of twenty years or more is mischievous and contrary to the economic interests and welfare of the public. The existence of such stale and abandoned interests creates uncertainties in titles and constitutes an impediment to the development of the mineral interests that may be present and to the development of the surface rights as well. The Act removes this impediment by returning the severed mineral estate to the surface rights owner. There is a decided public interest to be served when this occurs. The extinguishment of such an interest makes the entire productive potential of the property again available for human use." —— Ind., at ——, 406 N. E. 2d, at 627.

The court rejected the argument that a lapse of a vested mineral interest could not occur without affording the mineral owner prior notice and an opportunity to be heard. The court noted that "[p]rior to any extinguishment the owner of an interest will have had notice by reason of the enactment itself of the conditions which would give rise to an extinguishment and at a minimum a two-year opportunity to prevent those conditions from occurring by filing a statement of

---

[12] "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligations of Contracts, or grant any Title of Nobility."

[13] App. to Juris. Statement in No. 80–965, p. A–14; App. to Juris. Statement in No. 80–1018, p. A–16.

claim." [14]   The Indiana Supreme Court also rejected the argument that the statute effected a taking without just compensation.   The court reasoned that, like statutes of limitations, the Mineral Lapse Act was a permissible exercise of the police power of the State. [15]   Finally, the court rejected the argument that the statute violated the Equal Protection Clause of the Fourteenth Amendment by providing a special exception for owners of 10 or more interests who, through inadvertence, failed to preserve all such interests.   The court again noted that the purpose of the statute was to encourage

---

[14] —— Ind., at ——, 406 N. E. 2d, at 629.   The court distinguished *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, and *Bell* v. *Burson*, 402 U. S. 535, which had been relied on by the trial court, on the ground that these cases set forth notice requirements for adjudicatory proceedings, and not for a self-executing statute that uniformly affected all parties within the State.

[15] "The purposes of this Act as stated above at the beginning of this opinion are to remedy uncertainties in titles and to facilitate the exploitation of energy sources and other valuable mineral resources.   The dependence of local economies upon the mineral recovery industry and the entire State upon limited fossil fuel resources illustrates the public nature of these purposes.   The objectives are valid and similar to those served by acts of limitation and the law of adverse possession.   In limiting its incursion upon mineral rights to those which have been unused in the statutory sense for as long as twenty years, and in granting a two year period of grace after the enactment of the statute to preserve interests, the Legislature adopted means which are rationally related to such objectives, and which themselves provide a reasonable time and a simple and inexpensive method, taking into consideration the nature of the case, for preserving such interests.   We find that this Act is within the police power of the states and does not unconstitutionally impair the obligation of contracts."   —— Ind., at ——, 406 N. E. 2d, at 630–631.

The court also rejected an argument that the statute effected a taking without compensation in violation of the State Constitution and state eminent domain theory, on the ground that the State did not acquire the mineral interests for its own use and benefit.   The court emphasized that the Mineral Lapse Act does not "involve the injury to private property through conduct or activities of governmental agents or others having and exercising the power of eminent domain"; rather, the statute declares that "a lapse of a mineral interest will occur in the event of specified conditions and circumstances." *Id.*, at ——, 406 N. E. 2d, at 631.

the development of mineral interests, and held that it was rational for the Indiana Legislature to provide special protection for owners of 10 or more mineral interests since those owners are more likely to be able to engage in the actual production of mineral resources.[16]

## I

Appellants raise several specific challenges to the constitutionality of the Mineral Lapse Act. Before addressing these arguments, however, it is appropriate to consider whether the State has the power to provide that property rights of this character shall be extinguished if their owners do not take the affirmative action required by the State.[17]

In *Board of Regents* v. *Roth*, 408 U. S. 564, 577, the Court stated:

> "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

The State of Indiana has defined a severed mineral estate as a "vested property interest," entitled to "the same protection

---

[16] Several State Supreme Courts, considering similar state statutes, have reached a result contrary to that of the Indiana Supreme Court. See *Wilson* v. *Bishop*, 82 Ill. 2d 364, 412 N. E. 2d 522 (1980); *Contos* v. *Herbst*, 278 N. W. 2d 732 (Minn. 1979), appeal dism'd *sub nom. Prest* v. *Herbst*, 444 U. S. 804; *Wheelock* v. *Heath*, 201 Neb. 835, 272 N. W. 2d 768 (1978); *Chicago & N. W. Transportation Co.* v. *Pedersen*, 80 Wis. 2d 566, 259 N. W. 2d 316 (1977). But see *Van Slooten* v. *Larsen*, 410 Mich. 21, 299 N. W. 2d 704 (1980).

[17] Appellants do not specifically contend that the Mineral Lapse Act is an impermissible exercise of the legislative power of the State. Appellants argue, however, that the State has irrationally required extraction in 20 years of a resource that took "a millennia to create," Brief for Appellants in No. 80–965, p. 17, and has impermissibly transferred a fee interest in property from one private party to another. *Id.*, at 26.

as are fee simple titles." [18]   Through its Dormant Mineral Interests Act, however, the State has declared that this property interest is of less than absolute duration; retention is conditioned on the performance of at least one of the actions required by the Act.   We have no doubt that, just as a State may create a property interest that is entitled to constitutional protection, the State has the power to condition the permanent retention of that property right on the performance of reasonable conditions that indicate a present intention to retain the interest.

From an early time, this Court has recognized that States have the power to permit unused or abandoned interests in property to revert to another after the passage of time.   In *Hawkins* v. *Barney's Lessee*, 5 Pet. 457, the Court upheld a Kentucky statute that prevented a landowner from recovering property on which the defendant had resided for more than seven years under a claim of right.   The Court stated:

> "Such laws have frequently passed in review before this Court; and occasions have occurred, in which they have been particularly noticed as laws not to be impeached on the ground of violating private right.   What right has any one to complain, when a reasonable time has been given him, if he has not been vigilant in asserting his rights?"   *Id.*, at 466. [19]

---

[18] See n. 5, *supra*.

[19] Much of what Justice Johnson wrote for the Court in that case is relevant today:

"It is argued, that limitation laws, although belonging to the lex fori, and applying immediately to the remedy, yet indirectly they effect a complete divesture and even transfer of right.   This is unquestionably true, and yet in no wise fatal to the validity of this law.   The right to appropriate a derelict is one of universal law, well known to the civil law, the common law, and to all law: it existed in a state of nature, and is only modified by society, according to the discretion of each community.   What is the evidence of an individual having abandoned his rights or property?   It is clear that the subject is one over which every community is at liberty to make a rule for itself . . . ."   5 Pet., at 467.

After observing that "the state of Kentucky has established the rule of

Similarly, in *Wilson* v. *Iseminger*, 185 U. S. 55, the Court upheld a Pennsylvania statute that provided for the extinguishment of a reserved interest in ground rent if the owner collected no rent and made no demand for payment for a period of 21 years.[20] Though the effect of the Pennsylvania statute was to extinguish a fee simple estate of permanent duration, the Court held that the legislation was valid.[21]

seven years negligence to pursue a remedy," the Court noted that such a period was not unprecedented. The Court stated:

"In the early settlement of the country, the man who received a grant of land and failed, at first in three, and afterwards in five years, to seat and improve it, was held to have abandoned it: it received the denomination of lapsed land, was declared to be *forfeited* (Mercer's Abr.); and any one might take out a grant for it." *Id.*, at 467–468 (emphasis added).

[20] The Court specifically noted that, as a matter of state law, the reserved interest in ground rent had the characteristics of a fee simple estate of permanent duration. The Court described the interest as follows:

"It is defined to be a rent reserved to himself and his heirs by the grantor of land, out of the land itself. It is not granted like an annuity or rent charge, but is reserved out of a conveyance of the land in fee. It is a separate estate from the ownership of the ground, and is held to be real estate, with the usual characteristics of an estate in fee simple, descendible, devisable, alienable." 185 U. S., at 59.

[21] The Court also held that the statute could apply to interests created before the enactment of the statute, since the statute contained a reasonable grace period in which owners could protect their rights.

"It may be properly conceded that all statutes of limitation must proceed on the idea that the party has full opportunity afforded him to try his right in the courts. A statute could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily, whatever might be the purport of its provisions. It is essential that such statutes allow a reasonable time after they take effect for the commencement of suits upon existing causes of action; though what shall be considered a reasonable time must be settled by the judgment of the legislature, and the courts will not inquire into the wisdom of its decision in establishing the period of legal bar, unless the time allowed is manifestly so insufficient that the statute becomes a denial of justice." *Id.*, at 62–63.

The Court in *Iseminger*, *id.*, at 63, repeated the statement of Chief Justice Waite in *Terry* v. *Anderson*, 95 U. S. 628, 632–633, that "[t]his court has often decided that statutes of limitation affecting existing rights are not unconstitutional, if a reasonable time is given for the commencement of an action before the bar takes effect."

In these early cases, the Court often emphasized that the statutory "extinguishment" properly could be viewed as the withdrawal of a remedy rather than the destruction of a right.[22]  We have subsequently made clear, however, that, when the practical consequences of extinguishing a right are identical to the consequences of eliminating a remedy, the constitutional analysis is the same.  *El Paso* v. *Simmons*, 379 U. S. 497, 506–507.  The extinguishment of the property owners' "remedy" in *Hawkins* and *Iseminger* placed them in precisely the same position as that held by the mineral owners in the instant cases after their interests had lapsed.

The Indiana statute is similar in operation to a typical recording statute.  Such statutes provide that a valid transfer of property may be defeated by a subsequent purported transfer if the earlier transfer is not properly recorded.  In *Jackson* v. *Lamphire*, 3 Pet. 280, the Court upheld such a statute, even as retroactively applied to a deed that need not have been recorded at the time delivered.  The Court stated:

> "It is within the undoubted power of state legislatures to pass recording acts, by which the elder grantee shall be postponed to a younger, if the prior deed is not recorded within the limited time; and the power is the same whether the deed is dated before or after the passage of the recording act.  Though the effect of such a law is to render the prior deed fraudulent and void against a subsequent purchaser, it is not a law impairing the obligation of contracts; such too is the power to pass acts of limitations, and their effect.  Reasons of sound policy have led to the general adoption of laws of both descriptions, and their validity cannot be questioned.  The time

---

[22] In considering the validity of statutes such as those at issue in that case, the Court in *Iseminger* stated: "Such statutes, like those forbidding perpetuities and the statute of frauds, do not, in one sense, destroy the obligation of contracts as between the parties thereto, but they remove the remedies which otherwise would be furnished by the courts."  185 U. S., at 61.  See also *Terry* v. *Anderson, supra,* at 634.

and manner of their operation, the exceptions to them, and the acts from which the time limited shall begin to run, will generally depend on the sound discretion of the legislature, according to the nature of the titles, the situation of the country, and the emergency which leads to their enactment." *Id.*, at 290.

These decisions clearly establish that the State of Indiana has the power to enact the kind of legislation at issue. In each case, the Court upheld the power of the State to condition the retention of a property right upon the performance of an act within a limited period of time. In each instance, as a result of the failure of the property owner to perform the statutory condition, an interest in fee was deemed as a matter of law to be abandoned and to lapse.

It is also clear that the State has not exercised this power in an arbitrary manner. The Indiana statute provides that a severed mineral interest shall not terminate if its owner takes any one of three steps to establish his continuing interest in the property. If the owner engages in actual production, or collects rents or royalties from another person who does or proposes to do so, his interest is protected. If the owner pays taxes, no matter how small, the interest is secure. If the owner files a written statement of claim in the county recorder's office, the interest remains viable. Only if none of these actions is taken for a period of 20 years does a mineral interest lapse and revert to the surface owner.

Each of the actions required by the State to avoid an abandonment of a mineral estate furthers a legitimate state goal. Certainly the State may encourage owners of mineral interests to develop the potential of those interests; similarly, the fiscal interest in collecting property taxes is manifest. The requirement that a mineral owner file a public statement of claim furthers both of these goals by facilitating the identification and location of mineral owners, from whom developers may acquire operating rights and from whom the county may collect taxes. The State surely has the power to condition

the ownership of property on compliance with conditions that impose such a slight burden on the owner while providing such clear benefits to the State.[23]

## II

Two of appellants' arguments may be answered quickly. Appellants contend that the Mineral Lapse Act takes private property without just compensation in violation of the Fourteenth Amendment; they also argue that the statute constitutes an impermissible impairment of contracts in violation of the Contract Clause. The authorities already discussed mandate rejection of each of these arguments.

In ruling that private property may be deemed to be abandoned and to lapse upon the failure of its owner to take reasonable actions imposed by law, this Court has never required the State to compensate the owner for the consequences of his own neglect. We have concluded that the State may treat a mineral interest that has not been used for 20 years and for which no statement of claim has been filed as abandoned; it follows that, after abandonment, the former owner retains no interest for which he may claim compensation. It is the owner's failure to make any use of the property—and not the action of the State—that causes the lapse of the property right; there is no "taking" that requires compensation. The requirement that an owner of a property interest that has not been used for 20 years must come forward and file a current statement of claim is not itself a "taking."

---

[23] In *Miller* v. *Schoene*, 276 U. S. 272, the Court upheld the power of the State of Virginia to destroy ornamental cedar trees on private property that threatened the State's thriving apple industry. The Court stated: "It will not do to say that the case is merely one of a conflict of two private interests and that the misfortune of apple growers may not be shifted to cedar owners by ordering the destruction of their property; for it is obvious that there may be, and that here there is, a preponderant public concern in the preservation of one interest over the other. And where the public interest is involved preferment of that interest over the property interest of

Nor does the Mineral Lapse Act unconstitutionally impair the obligation of contracts. In the specific cases under review, the mineral owners did not execute the coal and oil leases in question until after the statutory lapse of their mineral rights. The statute cannot be said to impair a contract that did not exist at the time of its enactment. Appellants' right to enter such an agreement of course has been impaired by the statute; this right, however, is a property right and not a contract right. In any event, a mineral owner may safeguard any contractual obligations or rights by filing a statement of claim in the county recorder's office. Such a minimal "burden" on contractual obligations is not beyond the scope of permissible state action.[24]

## III

Appellants' primary attack on the Dormant Mineral Interests Act is that it extinguished their property rights without adequate notice. In advancing this argument, appellants actually assert two quite different claims. First, appellants argue that the State of Indiana did not adequately notify them of the legal requirements of the new statute. Second, appellants argue that a mineral interest may not be extinguished unless the surface owner gives the mineral owner advance notice that the 20-year period of nonuse is about to expire. When these two arguments are considered separately, it is clear that neither has merit.

## A

The first question raised is simply how a legislature must go about advising its citizens of actions that must be taken to avoid a valid rule of law that a mineral interest that has not been used for 20 years will be deemed to be abandoned. The answer to this question is no different from that posed for any

the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." *Id.*, at 279–280 (citations omitted).

[24] See *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398; *El Paso* v. *Simmons*, 379 U. S. 497.

legislative enactment affecting substantial rights. Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply. In this case, the 2-year grace period included in the Indiana statute forecloses any argument that the statute is invalid because mineral owners may not have had an opportunity to become familiar with its terms. It is well established that persons owning property within a State are charged with knowledge of relevant statutory provisions affecting the control or disposition of such property.[25]

It is also settled that the question whether a statutory grace period provides an adequate opportunity for citizens to become familiar with a new law is a matter on which the Court shows the greatest deference to the judgment of state legislatures. See *Jackson* v. *Lamphire*, 3 Pet., at 290; *Wilson* v. *Iseminger*, 185 U. S., at 62–63. A legislative body is in a far better position than a court to form a correct judgment concerning the number of persons affected by a change in the law, the means by which information concerning the law is disseminated in the community, and the likelihood that innocent persons may be harmed by the failure to receive adequate notice.[26]

In short, both the Indiana Legislature and the Indiana Supreme Court have concluded that a 2-year period was suffi-

---

[25] As stated in *North Laramie Land Co.* v. *Hoffman*, 268 U. S. 276, 283:

"All persons are charged with knowledge of the provisions of statutes and must take note of the procedure adopted by them; and when that procedure is not unreasonable or arbitrary there are no constitutional limitations relieving them from conforming to it. This is especially the case with respect to those statutes relating to the taxation or condemnation of land. Such statutes are universally in force and are general in their application, facts of which the land owner must take account in providing for the management of his property and safeguarding his interest in it."

See also *Anderson National Bank* v. *Luckett*, 321 U. S. 233, 243.

[26] Moreover, the adequacy of the 2-year grace period for Indiana property owners can be evaluated more reliably by the Indiana Supreme Court than by this Court.

cient to allow property owners in the State to familiarize themselves with the terms of the statute and to take any action deemed appropriate to protect existing interests. On the basis of the records in these two proceedings, we cannot conclude that the statute was so unprecedented and so unlikely to come to the attention of citizens reasonably attentive to the enactment of laws affecting their rights that this 2-year period was constitutionally inadequate. We refuse to displace hastily the judgment of the legislature and to conclude that a legitimate exercise of state legislative power is invalid because citizens might not have been aware of the requirements of the law.[27]

B

We have concluded that appellants may be presumed to have had knowledge of the terms of the Dormant Mineral Interests Act. Specifically, they are presumed to have known that an unused mineral interest would lapse unless they filed a statement of claim. The question then presented is whether, given that knowledge, appellants had a constitutional right to be advised—presumably by the surface owner—that their 20-year period of nonuse was about to expire.

In answering this question, it is essential to recognize the difference between the self-executing feature of the statute and a subsequent judicial determination that a particular lapse did in fact occur. As noted by appellants, no specific notice need be given of an impending lapse. If there has

---

[27] For these reasons, we reject the suggestion in the dissenting opinion that the Indiana statute is invalid because it does not adequately protect citizens from "the silent actions of the legislature." *Post*, at 549. This proposition is squarely at odds with the established principle that "[a]ll persons having property located within a state and subject to its dominion must take note of its statutes affecting the control or disposition of such property and of the procedure which they set up for those purposes." *Anderson National Bank* v. *Luckett, supra,* at 243; see n. 25, *supra.* Additional publication of the provisions of the Act—which the dissent admits would be constitutionally sufficient, see *post,* at 542–544, n. 2—was not constitutionally required.

been a statutory use of the interest during the preceding 20-year period, however, by definition there is no lapse—whether or not the surface owner, or any other party, is aware of that use. Thus, no mineral estate that has been protected by any of the means set forth in the statute may be lost through lack of notice. It is undisputed that, before judgment could be entered in a quiet title action that would determine conclusively that a mineral interest has reverted to the surface owner, the full procedural protections of the Due Process Clause—including notice reasonably calculated to reach all interested parties and a prior opportunity to be heard—must be provided.

Appellants place primary reliance on our decision in *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306. In that case the Court considered the constitutional sufficiency of notice given to the beneficiaries of a common trust fund of a judicial settlement of accounts by the trustee of the fund. The Court held that the notice by publication authorized by the relevant New York statute was not sufficient, since it was not reasonably calculated to apprise the beneficiaries of the pendency of the judicial proceeding. Justice Jackson, writing for the Court, stated:

> "Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.*, at 313.

Specifically, the Court held that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *id.*, at 314; the notice in *Mullane* was deficient "not because in fact it fail[ed] to reach every-

one, but because under the circumstances it [was] not reasonably calculated to reach those who could easily be informed by other means at hand." *Id.*, at 319.

The reasoning in *Mullane* is applicable to a judicial proceeding brought to determine whether a lapse of a mineral estate did or did not occur, but not to the self-executing feature of the Mineral Lapse Act. The due process standards of *Mullane* apply to an "adjudication" that is "to be accorded finality." The Court in *Mullane* itself distinguished the situation in which a State enacted a general rule of law governing the abandonment of property.[28] It has long been established that "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," *Grayned* v. *City of Rockford*, 408 U. S.

---

[28] "The ways of an owner with tangible property are such that he usually arranges means to learn of any direct attack upon his possessory or proprietary rights. Hence, libel of a ship, attachment of a chattel or entry upon real estate in the name of law may reasonably be expected to come promptly to the owner's attention. When the state within which the owner has located such property seizes it for some reason, publication or posting affords an additional measure of notification. A state may indulge the assumption that one who has left tangible property in the state either had abandoned it, in which case proceedings against it deprive him of nothing, *cf. Anderson National Bank* v. *Luckett*, 321 U. S. 233; *Security Savings Bank* v. *California*, 263 U. S. 282, or that he has left some caretaker under a duty to let him know that it is being jeopardized. *Ballard* v. *Hunter*, 204 U. S. 241; *Huling* v. *Kaw Valley R. Co.*, 130 U. S. 559. As phrased long ago by Chief Justice Marshall in *The Mary*, 9 Cranch 126, 144, 'It is the part of common prudence for all those who have any interest in [a thing], to guard that interest by persons who are in a situation to protect it.'" 339 U. S., at 316.

The Court in *Mullane* emphasized that "[i]n the case before us there is, of course, no abandonment." *Ibid.*

The dissent attempts to distinguish *Mullane* on the ground that, unlike the tangible interests that the Court in that case stated could be subject to an assumption of abandonment, the present cases concern "incorporeal interests" that have not been "directly attacked, seized, possessed, used, or depleted." *Post*, at 548, 549. We do not believe, however, that the State's assumption of abandonment in these cases is improper. As the In-

104, 108, but it has never been suggested that each citizen must in some way be given specific notice of the impact of a new statute on his property before that law may affect his property rights.

As emphasized above, appellants do not challenge the sufficiency of the notice that must be given prior to an adjudication purporting to determine that a mineral interest has not been used for 20 years. Appellants simply claim that the absence of specific notice prior to the lapse of a mineral right renders ineffective the self-executing feature of the Indiana statute. That claim has no greater force than a claim that a self-executing statute of limitations is unconstitutional. The Due Process Clause does not require a defendant to notify a potential plaintiff that a statute of limitations is about to run, although it certainly would preclude him from obtaining a declaratory judgment that his adversary's claim is barred without giving notice of that proceeding.

Appellants also rely on a series of cases that have required specific notice and an opportunity to be heard before a driver's license is suspended for failure to post security after an accident,[29] before property is seized pursuant to a prejudgment replevin order,[30] or before service is terminated by a

---

diana Supreme Court described, interests or estates in oil, gas, coal, and other minerals lying beneath the surface of the land are "interests in real estate," —— Ind., at ——, 406 N. E. 2d, at 627; oil, gas, coal, and other minerals are tangible interests that may be used and developed by a mineral owner. Moreover, the length of the period that is afforded to a mineral owner to use the interest, the variety and minimal extent of the actions that constitute a statutory use, and the length of the statutory grace period are sufficient to entitle the State to indulge in the assumption that— if no statutory use is made in a 20-year period and no statement of claim is filed in the 2-year grace period, if applicable—the mineral owner has abandoned the property. We need not decide today whether the State may indulge in a similar assumption in cases in which the statutory period of nonuse is shorter than that involved here, or in which the interest affected is such that concepts of "use" or "nonuse" have little meaning.

[29] *Bell* v. *Burson,* 402 U. S. 535.

[30] *Fuentes* v. *Shevin,* 407 U. S. 67.

public utility for failure to tender payment of amounts due.[31] In each of those cases, however, the property interest was taken only after a specific determination that the deprivation was proper.[32]   In the instant case, the State of Indiana has enacted a rule of law uniformly affecting all citizens that establishes the circumstances in which a property interest will lapse through the inaction of its owner.   None of the cases cited by appellants suggests that an individual must be given advance notice before such a rule of law may operate.[33]

---

[31] *Memphis Light, Gas & Water Div.* v. *Craft*, 436 U. S. 1.

[32] The nature of the state determination in *Fuentes* and *Craft* is clear. While less so in *Bell*, the Court specifically noted in that case:

"The main thrust of Georgia's argument is that it need not provide a hearing on liability because fault and liability are irrelevant to the statutory scheme.   We may assume that were this so, the prior administrative hearing presently provided by the State would be 'appropriate to the nature of the case.'   *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 (1950).   But '[i]n reviewing state action in this area . . . we look to substance, not to bare form, to determine whether constitutional minimums have been honored.'   *Willner* v. *Committee on Character*, 373 U. S. 96, 106–107 (1963) (concurring opinion).   And looking to the operation of the State's statutory scheme, it is clear that liability, *in the sense of an ultimate judicial determination of responsibility*, plays a crucial role in the Safety Responsibility Act."   402 U. S., at 541 (emphasis supplied).

[33] The dissenting opinion places almost exclusive reliance on broad language in *Lambert* v. *California*, 355 U. S. 225.   As the dissent itself admits, however, see *post*, at 547, n. 4, *Lambert* does not control the disposition of these cases.   The Court in *Lambert* considered the validity of an ordinance that made it a criminal offense for a convicted felon to remain in the city of Los Angeles for five days without registering with the Chief of Police.   The Court held:

"We believe that actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before a conviction under the ordinance can stand.   As Holmes wrote in The Common Law, 'A law which punished conduct which would not be blameworthy in the average member of the community would be too severe for that community to bear.'"   355 U. S., at 229.

*Lambert* concerns the *mens rea* that is necessary before the State may convict an individual of crime.   See *United States* v. *Freed*, 401 U. S. 601; *United States* v. *International Minerals & Chemical Corp.*, 402 U. S. 558. Its application has been limited, lending some credence to Justice Frank-

We have held that the State may impose on an owner of a mineral interest the burden of using that interest or filing a current statement of claim. We think it follows inexorably that the State may impose on him the lesser burden of keeping informed of the use or nonuse of his own property. We discern no procedural defect in this statute.[34]

## IV

The Indiana statute allows a mineral owner to retain an interest, notwithstanding a failure to file a statement of claim within the statutory period, if he satisfies four specific conditions: (1) he must own at least 10 mineral interests in the county; (2) he must have made a diligent effort to preserve all his interests and have succeeded in preserving some; (3) his failure to preserve the interest in question must have been

---

furter's colorful prediction in dissent that the case would stand as "an isolated deviation from the strong current of precedents—a derelict on the waters of the law." 355 U. S., at 232.

[34] The dissenting opinion suggests that as a practical matter notice must precede any attempt to develop a lapsed mineral estate, see *post*, at 553–554, and that there is thus no reason not to require notice in advance of the lapse itself. This suggestion ignores the fact that, independent of the interest in facilitating the development of mineral rights, the State has an interest in eliminating fractured mineral estates that were created long ago, have been unused for the statutory period, and create uncertainties in title records. As stated by the Indiana Supreme Court, "[t]he purposes of this Act . . . are to remedy uncertainties in titles and to facilitate the exploitation of energy sources and other valuable mineral resources." —— Ind., at ——, 406 N. E. 2d, at 630. The State legitimately may treat a mineral interest that has been unused for the statutory period and for which the owner has not bothered to file a statement of claim as worthless and abandoned; the State has an interest in eliminating such encumbrances from title records. Moreover, if a mineral interest has been inactive for a sufficient period of time, a developer may well decide that notice is entirely unnecessary. Title opinions and title insurance, based normally on a thorough search of county records, may be sufficient to assure a potential developer that an ancient and dormant mineral estate, like other possible clouds on title, is without legal significance. In any event, the question in these cases is whether additional notice is constitutionally required, and not whether such notice might better serve the purposes of the statute.

through "inadvertence"; and (4) he must file a statement of claim within 60 days after receiving notice that the mineral interest has lapsed.[35]  Appellants contend that this special exception violates the Equal Protection Clause of the Fourteenth Amendment.

There is nothing in the records to tell us how often, if ever, this statutory exception has been invoked.  Nor do the records indicate the number of persons who own 10 or more interests in any one county in Indiana.  Since mineral interests may be bought and sold like other property, and often have little value, the composition of the class benefited by this exception is subject to constant change.  Unlike those classes that are defined by personal characteristics, anyone who purchases 10 fractional mineral interests in the same county, of whatever value, can join this favored class.

Although appellants do not suggest that they are financially unable to join the special class, or that its existence has any adverse impact on their own rights—or indeed that excision of the exception from the Act would provide them with any benefit whatsoever—they nevertheless argue that it is basically unfair to treat owners of multiple interests more favorably than they are treated.  The Indiana Supreme Court has explained, however, that the State has an interest in encouraging the assembly of multiple interests in a single ownership because such owners are more likely to be able to engage in the actual production of mineral resources.[36]  This

---

[35] See n. 8, *supra*.

[36] "Minerals exist within the earth in strata and formations which do not necessarily coincide with the manner in which man has chosen to divide the surface area.  Consequently it is commonly necessary to assemble several mineral interests in order to render the extraction of minerals safe and profitable.  The Legislature could reasonably have concluded that those meeting the criteria set forth above include those most likely to assemble such interests and actually produce minerals.  The separate classification of interests so held within these essential clusters is rationally related to the legitimate objectives of the enactment and is consequently not contrary to the requirements of state and federal equal protection."  —— Ind., at ——, 406 N. E. 2d, at 631–632.

state interest is unquestionably legitimate. Thus, a statutory provision that encourages multiple ownership—by giving that kind of ownership additional protection against forfeiture after it has been assembled—is related to the central purpose of the statute. Since the exception furthers a legitimate statutory purpose, and has no adverse impact on persons like the appellants who own fewer mineral interests, the exception does not violate the Equal Protection Clause of the Fourteenth Amendment.

The judgment of the Supreme Court of Indiana is affirmed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE WHITE, JUSTICE MARSHALL, and JUSTICE POWELL join, dissenting.

There is no measurable dispute in these cases concerning Indiana's power to control, define, and limit interests in land within its boundaries. Nor is there any question that Indiana has a legitimate interest in encouraging the productive use of land by establishing a registration system to identify the owners of mineral rights. Nor indeed is there any question that extinguishment of a mineral owner's rights may be an appropriate sanction for a failure to register. The question presented here is simply whether the State of Indiana has deprived these appellants of due process of law by extinguishing their pre-existing property interests without regard to whether they knew, and without providing any meaningful mechanism by which they might have learned, of the imminent taking of their property or their obligations under the law.

I

The State of Indiana has historically afforded owners of incorporeal interests in minerals all the protections and privileges enjoyed by any owner of an estate in land held in fee simple. The mineral interests of the appellants here were thus assuredly within the scope of the dual constitutional guarantees that there be no taking of property without just

compensation, and no deprivation of property without the due process of law. By the statute at issue in these cases, Indiana has imposed upon the owners of mineral interests the requirement that they pay taxes, or put their interest to productive use, or make their identity known by filing a statement of claim every 20 years. If the mineral interest owner fails to comply with these conditions, his interest is extinguished, and the mineral rights in the land are, by operation of law, merged with the surface estate, to the benefit of the surface owner.[1]

---

[1] Indiana Code § 32–5–11–1 (1976) provides that

"Any interest in coal, oil, and gas, and other minerals, shall, if unused for a period of 20 years, be extinguished, unless a statement of claim is filed in accordance with section five [32–5–11–5] hereof, and the ownership shall revert to the then owner of the interest out of which it was carved."

A mineral interest is deemed "used" for the purposes of the statute

"when there are any minerals produced thereunder or when operations are being conducted thereon for injection, withdrawal, storage or disposal of water, gas or other fluid substances, or when rentals or royalties are being paid by the owner thereof for the purpose of delaying or enjoying the use or exercise of such rights or when any such use is being carried out on any tract with which such mineral interest may be unitized or pooled for production purposes, or when, in the case of coal or other solid minerals, there is production from a common vein or seam by the owners of such mineral interests, or when taxes are paid on such mineral interest by the owner thereof. Any use pursuant to or authorized by the instrument creating such mineral interest shall be effective to continue in force all rights granted by such instrument." Ind. Code § 32–5–11–3 (1976).

With respect to the statement of claim, the statute specifies the relevant time limits:

"The statement of claim provided in section one above [32–5–11–1] shall be filed by the owner of the mineral interest prior to the end of the twenty year period set forth in section two [one] [32–5–11–1] or within two years after the effective date [September 2, 1971] of this act, whichever is later, and shall contain the name and address of the owner of such interest, and description of the land, on or under which such mineral interest is located. Such statement of claim shall be filed in the office of the Recorder of Deeds in the county in which such land is located. Upon the filing of the statement of claim within the time provided, it shall be deemed that such mineral interest was being used on the date the statement of claim was filed." Ind. Code § 32–5–11–4 (1976).

As to one class of mineral interest owners, there is no question that the statute is a constitutionally proper exercise of the State's power. Every mineral interest in land carved from the fee after the effective date of the statute was carved subject to the statute's limitations. In *prospective* application the statute simply provides that any instrument purporting to transfer a mineral interest carries with it the implicit condition that unless the transferee uses the land within the meaning of the statute, his interest will revert to the transferor. It is only where the State seeks to change the fundamental nature of a property interest already in the hands of its owner that the operative restrictions of both the Takings Clause and the Due Process Clause come into play.

If Indiana were by simple fiat to "extinguish" all pre-existing mineral interests in the State, or to transfer those interests to itself, to surface owners, or indeed to anyone at all, that action would surely be unconstitutional and unenforceable—at least absent just compensation. That is not the case here for, as the Court points out, *ante*, at 529, 531, the State has offered the owner of a mineral interest several options by which he may preserve his interest, and a grace period in which he may do so. Because the State has provided these options, the Court concludes that there has been no unconstitutional deprivation of property: "It is the owner's failure to make any use of the property—and not the action of the State—that causes the lapse of the property right . . . ." *Ante*, at 530. The Court disdains any serious consideration of whether the saving options afforded by the State are in any meaningful way within the reach of the mineral interest owners.[2] In this respect the Court errs, for the Due Process

---

[2] In an attempt to support its refusal seriously to inquire into the adequacy of the protections afforded mineral interest owners by which they might preserve their property, the Court analogizes the Indiana statute to a Recording Act and draws on the pre-Fourteenth Amendment case of *Jackson* v. *Lamphire*, 3 Pet. 280 (1830). *Ante*, at 528–529, 532. The Court's reliance is misplaced. In *Jackson* v. *Lamphire*, *supra*, we recognized that the manner of implementing a Recording Act is to be left to the

Clause of the Fourteenth Amendment requires the Court to make precisely the inquiry the Court avoids. As we have noted:

> "It does not follow, however, that what [a State] can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 16–17 (1976).

There is much to be said for the maxim upon which the Court places its principal reliance in upholding the retrospective application of this statute: that each citizen may be

---

discretion of the legislature in the first instance. But we also recognized the natural limits of that legislative authority.

"The time and manner of their operation, the exceptions to them, and the acts from which the time limited shall begin to run, will generally depend on the sound discretion of the legislature, according to the nature of the titles, the situation of the country, and the emergency which leads to their enactment. *Cases may occur where the provisions of a law on those subjects may be so unreasonable as to amount to a denial of a right, and call for the interposition of the court; but the present is not one.*" *Id.*, at 290 (emphasis added).

It is not at all surprising that we did not find the exercise of legislative authority in *Jackson* v. *Lamphire* unreasonable. In 1797, the New York Legislature established a Commission to settle competing claims to land within a particular county. The New York Act provided a 2-year period, following the action of the Commission, in which any party adversely affected might dissent and preserve his right to recover his title. *Id.*, at 282–283. In addition, before the Commission could act, *the New York legislation required precisely those forms of notice that appellants in these cases complain are lacking in the Indiana statute.* The Commission was expressly charged with the responsibility of notifying the populace that it was convening to resolve disputes concerning land within the county. *Id.*, at 283. The New York Act further provided that

"in all cases where there are filed or recorded . . . two or more deeds from one and the same person, or in the same right to different persons, *if any person interested under either of them shall neglect to make his claim, and in all cases where several persons appear to have claims to one and the*

charged with knowledge of the law.[3]   The justification for that rule is its necessity.   As a practical matter, a State cannot afford notice to every person who is or may be affected by a change in the law.   But an unfair and irrational exercise of state power cannot be transformed into a rational exercise merely by invoking a legal maxim or presumption.   If it is to survive the scrutiny that the Constitution requires us to afford laws that deprive persons of substantial interests in property, an enactment that relies on that presumption of knowledge must evidence some rational accommodation between the interests of the State and fairness to those against whom the law is applied.   Cf. *Vlandis* v. *Kline*, 412 U. S. 441 (1973).   By acknowledging that there is some limit to the exercise of legislative power to transform the interests of persons in property, we do not depart from the principle of utmost deference to the judgment of the legislature to reach those accommodations in the first instance.   But the Constitution puts even our most cherished legal maxims and presumptions to the test of fairness and rationality in light of common experience.   "[I]n passing on the constitutionality of a state law, its effect must be judged in the light of its practi-

---

*same piece of land, and any of them do not appear before the said commissioners, they shall cause a notice to be published in the newspapers aforesaid, and continued for six weeks, requiring all persons interested in such land to appear at a certain time and place therein mentioned, not less than six months from the date of such notice, and exhibit their claims to the same land." Id.*, at 284 (emphasis added).

If the Indiana statute at issue in these cases provided a 2-year period in which mineral interest owners could assert their interests, *following* notice by publication, as provided in the New York Act at issue in *Jackson* v. *Lamphire*, I would readily agree that the Indiana statute was reasonable even as applied to existing mineral interests.   Absent such notice, the 2-year grace period provided by Indiana is constitutionally meaningless.

[3] Despite suggestive references to cases involving abandonment of property, *ante*, at 526–528, the Court does not rest on the argument that failure to comply with the provisions of the Indiana statute implies abandonment. Nor could the Court so rest.   The very cases cited by the Court demon-

cal application to the affairs of men as they are ordinarily conducted." *North Laramie Land Co.* v. *Hoffman,* 268 U. S. 276, 283 (1925).

Thus, we have recognized certain very limited circumstances in which a State's reliance on the maxim that a man may be presumed to know the law is not consistent with the restrictions imposed by the Constitution on legislative action. In *Lambert* v. *California,* 355 U. S. 225 (1957), a municipal ordinance made it an offense for any convicted felon to remain in the city of Los Angeles for more than five days without registering with the police.   We held that the ordinance, which purported to deprive a person of liberty for failing to register, could not be applied to a person who neither knew, nor could reasonably have been expected to know, of his legal obligation.   As we noted:

> "[W]e deal here with conduct that is wholly passive— mere failure to register.   It is unlike the commission of acts, or the failure to act under circumstances that

---

strate that the finding of abandonment with respect to rights in land has historically been associated with the property owner's failure to pursue legal remedies over the course of some legislatively established period of time.   See *Wilson* v. *Iseminger,* 185 U. S. 55 (1902); *Hawkins* v. *Barney's Lessee,* 5 Pet. 457, 466–467 (1831).   The mineral interest owners in these cases plainly have not been derelict in pressing their rights.   Until their interests were extinguished "by operation of law" they simply had no occasion to pursue any legal action.   Moreover, that mineral interest owners may have failed to exploit their interest for 20 years, during which period it may not have been economically feasible to extract minerals from the property, and during which period there was no statutory obligation to use the interest in any manner, does not suggest abandonment.   Cf. *Provident Savings Institution* v. *Malone,* 221 U. S. 660, 664 (1911).   Nor can the intent to abandon, or any independent state interest supporting the Indiana statute, be found in appellants' failure to pay taxes.   At no time have taxes been separately assessed with respect to the reserved mineral interest in No. 80–1018.   App. in No. 80–1018, p. 7.   While the record is slightly more ambiguous with respect to No. 80–965, appellees conceded at oral argument that the counties of Indiana generally do not assess taxes on mineral interests that are neither in use nor in the process of development. Tr. of Oral Arg. 25.

should alert the doer to the consequences of his deed. The rule that 'ignorance of the law will not excuse' is deep in our law, as is the principle that of all the powers of local government, the police power is 'one of the least limitable.' On the other hand, due process places some limits on its exercise. Engrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. *Notice is required before property interests are disturbed,* before assessments are made, before penalties are assessed. *Notice is required in a myriad of situations where a penalty or forfeiture might be suffered for mere failure to act. . . .*

"Registration laws are common and their range is wide. Many such laws are akin to licensing statutes in that they pertain to the regulation of business activities. But the present ordinance is entirely different. *Violation of its provisions is unaccompanied by any activity whatever,* mere presence in the city being the test. Moreover, *circumstances which might move one to inquire as to the necessity of registration are completely lacking. . . . [T]his appellant on first becoming aware of her duty to register was given no opportunity to comply with the law and avoid its penalty, even though her default was entirely innocent.*" *Id.*, at 228–229 (emphasis added) (citations omitted).

There is, of course, no general requirement that a State take affirmative steps to inform its citizenry of their obligations under a particular statute before imposing legal sanctions for violation of that statute. *Lambert* suggests no such general requirement. Rather, that case highlights the limited circumstances in which the State's reliance on a presumption of knowledge strains the constitutional requirement that the liberty and property of persons be dealt with fairly and rationally by the State. The State's power to impose sanctions on individuals is to be tested in part against the rationality of the proposition that those individuals were

or could have been aware of their legal obligations. The present cases, like *Lambert*, involve the necessity of notice in the context of a registration statute sufficiently unusual in character, and triggered in circumstances so commonplace, that an average citizen would have no reason to regard the triggering event as calling for a heightened awareness of one's legal obligations.[4]

The opinion of the Court suggests that the presumption of knowledge of the law is not unreasonable in cases such as these because it is a customary feature of property ownership that the landowner monitor the Acts of the legislature that may affect his interest. *Ante*, at 532. The Court would appear to treat property owners as businessmen, of whom we do indeed expect the greatest attentiveness to regulatory obligations in the conduct of their business affairs. But neither our cases nor our experience supports the Court's supposition about the diligence reasonably expected of property owners. Property owners have historically been allowed to rest easy in the knowledge that their holding is secure, absent some affirmative indication to the contrary; to rely on the general practice that "[n]otice is required before property interests are disturbed, before assessments are made, before penalties are assessed. Notice is required in a myriad of situations where a penalty or forfeiture might be suffered for mere fail-

---

[4] Because *Lambert* involved the imposition of *criminal sanctions*, giving rise to a rigor in the application of due process standards that would be inappropriate where only interests in property are at stake, it cannot control the disposition here. But the rigor with which the due process test was applied in *Lambert* is worth noting. The city's interest in that case lay in identifying felons within its boundaries. The ordinance failed for want of notice. But it is difficult to conceive how the city might have contrived an ordinance, effecting the same purpose, short of informing every person who entered the city that if he was a convicted felon he was obliged to register with the police. Because it was the singular purpose of the city to identify felons, individualized notice was simply incompatible with the legislative purpose. Nevertheless, we held the ordinance unenforceable. As will be noted below, the requirement of prior notice with respect to the registration scheme at issue in these cases, does not limit the ability of the State to further its asserted objectives. See *infra*, at 551–554.

ure to act." *Lambert* v. *California*, 355 U. S., at 228. Surely no contrary understanding of the obligations of property ownership could be attributed to the mineral interest owners of Indiana. It was their historic complacency, heretofore undisturbed by statutory obligation, that prompted the State of Indiana to install the regulatory regime at issue here.

The Constitution does, of course, permit the interests of a property owner to be adversely affected upon notice less exacting than those mechanisms of notification deemed minimally acceptable in other contexts. But the rationale for this standard of "lesser notice" with respect to matters involving land bears restating for the contrast that it presents with the circumstances of these cases:

> "[P]ublication traditionally has been acceptable as notification *supplemental* to other action which in itself may reasonably be expected to convey a warning. The ways of an owner with *tangible property* are such that he usually arranges means to learn of any *direct attack* on his possessory or proprietary rights. Hence, libel of a ship, attachment of a chattel or entry upon real estate in the name of law may reasonably be expected to come promptly to the owner's attention. When the state within which the owner has located such property seizes it for some reason, publication or posting affords an additional measure of notification. A state may indulge the assumption that one who has left *tangible* property in the state either has abandoned it, in which case proceedings against it deprive him of nothing, or that he has left some caretaker under a duty to let him know that it is being jeopardized." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 316 (1950) (emphasis added; citations omitted).

It may be reasonable to expect property owners to maintain sufficient awareness of their property to mark those situations in which the property is physically disturbed with some scrutiny of their duties and obligations under the law. The owners of the incorporeal interests at issue here are

hardly in a similar situation. There is no event or circumstance to which they might have turned their powers of observation; nothing has been directly attacked, seized, possessed, used, or depleted. The only "caretaker" who could have guarded the interest of appellants from the silent actions of the legislature and the surface owner, is a caretaker charged with the responsibility of daily surveillance over happenings in the state legislature. In light of "the affairs of men as they are ordinarily conducted," a State may not constitutionally attribute to each citizen the foresight, or the continuing duty, to maintain a lobbyist in the state capital in order to guard his property from extinguishment.

The Court also relies on cases involving the application of legislatively foreshortened limitations periods to causes of actions that have already vested. *Ante,* at 532. But those cases illustrate, rather than refute, the constitutional principle that reliance on the maxim of presumed knowledge of the law is limited by the reasonableness of applying that maxim in a particular class of cases. The Court has upheld retroactive adjustments to a limitations period only when the legislature has provided a grace period during which the potential plaintiff could reasonably be expected to learn of the change in the law and then initiate his action. In the context of a retrospective statute of limitations, a reasonable grace period provides an adequate guarantee of fairness. Having suffered the triggering event of an injury, a potential plaintiff is likely to possess a heightened alertness to the possibly changing requirements of the law bearing on his claim. Because redress necessarily depends on recourse to the State's judicial system, the State is free to condition its intervention on rules of procedure, and further, to impose on the potential plaintiff the obligation to monitor changes in those rules. Plaintiffs, and their attorneys, are so aware.

The situation of appellants here is not at all similar. The statute does not operate upon the dormant mineral interest owner after he has suffered some direct affront to his property such that he might reasonably be called upon to increase

his awareness of his legal obligations. The mineral interest owner has not been derelict in pressing rights against third parties such that the State may reasonably assume he has abandoned his interest. The mineral interest owner has no reason to anticipate an occasion for state assistance, and thus no reason to monitor the ground rules upon which the State conditions its aid. In these cases the State has taken the initiative in seeking to regulate heretofore unregulated incorporeal interests in land under circumstances in which a need for heightened attentiveness to the law cannot reasonably be apprehended by the mineral interest owner. In these circumstances, the empirical foundation of the assertion that passage of a statute will create knowledge of its provisions is at its weakest.

This does not end the inquiry, for the State may have an identifiable interest in not making provision for notice in a particular circumstance. If there were such an interest, the Constitution would not lightly supplant the legislative judgment. I thus turn to the asserted interests of the State in the procedure established here.

## II

It is plain that that sheer impracticality makes it implausible to expect the State *itself* to apprise its citizenry of the enactment of a statute of general applicability. The State may, however, feasibly provide notice when it asserts an interest directly adverse to particular persons, and may in that circumstance be constitutionally compelled to do so. That is not the situation presented in these cases, for the mineral interest owner's failure to comply with the statute results in neither a fine nor an escheat. Rather, his interest is effectively transferred to the surface owner. While the State is not disinterested, as a policy matter, in whether the mineral interest owner files a notice of claim, it sanctions a failure to comply by adjusting the relative rights of the mineral interest owner as against another citizen. In this context it is

again helpful to examine—and contrast—the reasons supporting the lack of notice in the context of retrospectively applied limitations periods.

First, statutes of limitations "are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Chase Securities Corp.* v. *Donaldson,* 325 U. S. 304, 314 (1945). The very interest asserted by the State in imposing a statute of limitations—avoiding trial of stale claims—would be defeated by extending the time in which the plaintiff may bring his suit until such time as he may learn of the existence of the statute or the fact that it may soon run. In addition, with respect to statutes of limitations, pre-expiration notice is, as a practical matter, impossible: The potential defendant may not be aware of the potential plaintiff's injury, let alone the plaintiff's future intention to sue. Under these circumstances the potential defendant cannot be expected to monitor the law on behalf of his future—perhaps unknown—adversary. In sum, a State need not make provision for notice with respect to the retroactive application of a statute where it would defeat a legitimate State interest, or would be infeasible in the context of the statutory scheme.

In these cases, Indiana asserts an interest in ensuring the productive use of land within its boundaries, and particularly in promoting the exploitation of land containing energy resources such as coal, gas, and oil. The existence of stale and abandoned mineral interests impedes the development of those mineral resources, and hinders the development of the surface as well, by preventing the willing buyer from making contact with a willing seller. To facilitate the operation of the market with respect to mineral development, Indiana has required, by the statute at issue here, that the mineral interest owner file a statement of his claim once every 20 years, or suffer extinguishment of his unused interest. This minimal burden on the mineral rights owner is intended to ensure that

the interest owner is identifiable, and thus suffices to maintain his accessibility to potential purchasers. Should the notice not be filed, the State's interest in identification is equally well served: the surface owner, presumably identified readily by virtue of his interest in a parcel of tangible property, becomes the beneficiary of the mineral interest owner's default. By facilitating identification of the owners of the mineral interest, the statute permits the willing buyer—presumably someone who *would* wish to put the land to productive use—to locate the presumably willing seller, and thus reach the type of deal that could lead to an economically productive use of the land. With respect to the treatment of mineral interest owners, such as appellants here, whose 20-year period had run or partially run as of the date of the enactment, the State's interest is no different. Although the operative period may be abbreviated, the State seeks only to ensure either use, or identification.

It is difficult to conceive how the State's interest is served by *not* requiring the surface owner to notify the mineral rights owner before taking title to his interest; I do not understand either the private appellees, or the State of Indiana as intervenor, to identify any affirmative state interest in failing to provide for pre-extinguishment notice. It might be supposed that a requirement of pre-extinguishment notice by the surface owner would present an untoward economic burden on the surface owner that would impede the purposes of the statute or would otherwise be inconsistent with the statutory framework. But it is plain on the face of the statute that this is not so.

Although the statute is self-executing as to one class of mineral interest owners, notice is required before the interests of another class of mineral interest owners are terminated. If the mineral interest owner is one who owns 10 mineral interests in the county and has made diligent effort to preserve his interest, and his failure to preserve is inadvertent, he is afforded the opportunity to file a statement of claim "within sixty (60) days after publication of notice as

provided in section seven [32–5–11–7] herein, if such notice is published, and if no such notice is published, within sixty (60) days after receiving actual knowledge that such mineral interest had lapsed."[5]   Ind. Code § 32–5–11–5(4) (1976).   The person charged with the *responsibility* of providing notice by publication to a holder of 10 interests or more, is, of course, the surface owner.   And indeed, the statute sets forth explicitly the manner in which such notice by publication is to be made:

> "Any person who will succeed to the ownership of any mineral interest, upon the lapse thereof, may give notice of the lapse of such mineral interest by publishing the same in a newspaper of general circulation in the county in which such mineral interest is located, and, if the address of such mineral interest owner is shown of record or can be determined upon reasonable inquiry, by mailing within ten days after such publication a copy of such notice to the owner of such mineral interest.   The notice shall state the name of the owner of such mineral interest, as shown of record, a description of the land, and the name of the person giving such notice.   If a copy of such notice, together with an affidavit of service thereof, shall be promptly filed in the office of the Recorder of Deeds in the county wherein such land is located, the record thereof shall be prima facie evidence, in any legal proceedings, that such notice was given."   Ind. Code § 32–5–11–6 (1976).

Because no surface property owner could claim clear title to the mineral interest absent such notice—or else a potential purchaser would suffer the possibility that some holder of 10

---

[5] It may be, as the Court holds, that the State may rationally prefer the holders of 10 interests to those who hold less, and that the holders of more numerous claims may thus be afforded special protections.   The distinction drawn between the two classes of holders would thus survive the scrutiny of the Equal Protection Clause.   The Court opinion fails, however, to identify any state interest in denying notice to a holder of less than 10 interests in the first instance.

or more interests might later come forward to claim his rights—such notice is, in practical operation, likely to be provided in every case. The only difficulty is that as construed by the Court today, the statutory notice comes too late for mineral interest holders in the position of appellants to assert their continued interest in their property rights. Because it is clear to me that a form of pre-extinguishment notice, procedurally comparable to that statutorily provided with respect to owners of 10 interests or more, is entirely consistent with the asserted legislative purpose, I would hold that such notice was constitutionally required before a person, otherwise without notice of his obligations under the statute, might be deprived of his property "by operation of law."

## III

In the exercise of a State's police powers, and perhaps particularly with respect to matters involving the regulation of land, we owe the judgments of state legislatures great deference. Nevertheless, the Due Process Clause of the Fourteenth Amendment was designed to guard owners of property from the wholly arbitrary actions of state governments. As applied retrospectively to extinguish the rights of mineral interest owners for their failure to have made use of their interests within a prior 20-year period, Indiana's statutory scheme would likely effect an unlawful taking of property absent the proviso that such mineral interest owners could preserve their rights by filing a notice of claim within the 2-year grace period. Given the nature of the scheme established, there is no discernible basis for failing to afford those owners such notice as would make the saving proviso meaningful. As applied to mineral interest owners who were without knowledge of their legal obligations, and who were not permitted to file a saving statement of claim within some period following the giving of statutory notice by the surface owner, the statute operates unconstitutionally. In my view, under these circumstances, the provision of no process simply cannot be deemed due process of law. I respectfully dissent.