**L.E. SERVICES, INC., Virginia Bonyor, and Neil Bonyor, Appellants– Defendants,**

v.

**STATE LOTTERY COMMISSION OF INDIANA, Appellee–Plaintiff.**

No. 49A04–9406–CV–226.

Court of Appeals of Indiana, Fourth District.

Jan. 31, 1995.

---

Susan L. Williams, Brown, Todd & Heyburn, New Albany, for appellants.

Linda L. Pence and David J. Hensel, Law Offices of Linda L. Pence, Indianapolis, for appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Defendant–Appellant L.E. Services, Inc., Virginia Bonyor and Neil Bonyor (hereinafter collectively referred to as L.E. Services) bring this interlocutory appeal from the trial court's entry of partial summary judgment in favor of the State Lottery Commission of Indiana (Lottery Commission) and the denial of L.E. Services' motion for summary judgment.

We affirm.

### ISSUES

L.E. Services raises six issues for our review, which we restate as follows:

1. Whether the trial court was correct in concluding that L.E. Services' proposed activities were violative of Indiana's anti-gambling laws.

2. Whether the trial court was correct in concluding that L.E. Services' proposed activities were violative of the Indiana Civil Remedies for Racketeering Activity Act.

3. Whether Indiana's anti-gambling statutes are constitutionally sound.

4. Whether the Lottery Commission properly designated evidentiary material pursuant to Ind.Trial Rule 56.

5. Whether the trial court was correct in granting injunctive relief.

### FACTS AND PROCEDURAL HISTORY

L.E. Services is a Delaware corporation which was authorized to do business in Indiana in January, 1992. Virginia and Neil Bonyor are currently residents of New Jersey, and are president and vice-president, respectively, of L.E. Services.

The Lottery Commission is "a body politic and corporate separate from the [S]tate" pursuant to IND.CODE 4–30–3–1 (1988). The Commission is charged by statute to maintain the integrity and dignity of the Hoosier Lottery. L.E. Services' proposed business plan was thwarted by the Lottery Commission when the Commission secured injunctive relief prohibiting L.E. Services from executing its plan.

Pursuant to the court's order and mutual agreement, the parties jointly submitted a stipulation of facts for purposes of the hearing on their cross motions for summary judgment. In granting partial summary judgment in favor of the Lottery Commission, the trial court relied exclusively on the stipulation of facts.

### I. Stipulation of Facts

An outline of L.E. Services' proposed business plan was submitted in the stipulation of facts. L.E. Services' proposed business plan was to provide, via service outlets/retailers, an order entry service for state lottery tickets from various jurisdictions, including Ohio, Pennsylvania, New York, Illinois, California, Florida and Michigan, and excluding Indiana. The plan was intended to provide a means by which Indiana residents could participate in other legally authorized state operated lotteries.

Specifically, L.E. Services intended to sell these out-of-state lottery tickets to Indiana residents by hiring sales representatives to solicit Indiana retailers. The Indiana retailers would then enter into Service Outlet Agreements with L.E. Services. Pursuant to the Service Outlet Agreement, L.E. Services would receive, for profit, purchase orders for out-of-state lottery tickets from the service outlets, via computer transmission telephone lines (modem). L.E. Services intended to charge the service outlet a one time software license user fee and operational set up fee of

$495.00. Indiana resident customers would then place their orders at the service outlet, paying the face value of the ticket plus the L.E. Services service charge. L.E. Services would contractually agree to pay the service outlet 20% of its service charge. L.E. Services would then purchase the out-of-state tickets from the authorized state approved retailer, through its agents in the targeted states for face value, and either deliver the tickets directly to the Indiana resident via courier service or retain the tickets in the issuing state. L.E. Services had several proposed options for the customer with a winning ticket. Under each of the plans, all winning tickets were redeemable exclusively through the state of issuance. Neither the service outlet nor L.E. Services made monetary payment on any winning ticket. However, L.E. Services did offer to accept an assignment of a winning ticket in exchange for future services through L.E. Services. L.E. Services would not have provided an order entry service for Indiana lottery tickets.

Prior to the inception of the business, the Lottery Commission sought and secured an injunction preventing L.E. Services from carrying out its plan. Thus, at the time the restraining order was secured, L.E. Services was not operational.

## II. Procedural History

The Lottery Commission filed a nine count complaint against L.E. Services alleging in pertinent part that L.E. Services' proposed business plan was violative of state and federal anti-gambling laws and the Indiana State Lottery Statute. The Lottery Commission further made application for a temporary restraining order and motioned for a preliminary injunction to enjoin L.E. Services from going forward with its plan. By order of the court and by agreement of the parties, the issues were to be submitted to the court by cross-motions for summary judgment.

After taking the matter under advisement, the court granted partial summary judgment in favor of the Lottery Commission. Summary judgment was entered in favor of the

Lottery Commission as to: Count I Professional Gambling, I.C. 35–45–5–3 (1988); Count II Promoting Professional Gambling, I.C. 35–45–5–4 (1994); Count III Unlawful Gambling, I.C. 35–45–5–2 (1988); Count VIII Indiana Civil Remedies for Damages Caused by Racketeering Activity, I.C. 34–4–30.5–1 *et seq.*[1]

## STANDARD OF REVIEW

■ Before reaching the merits of this appeal, we recite the familiar standard of review by which we review the granting of motions for summary judgment. When reviewing the trial court's ruling on a motion for summary judgment, this court applies the same standard as the trial court. *American Family Mut. Ins. Co. v. Dye* (1994), Ind. App., 634 N.E.2d 844, 846, *reh'g denied, trans. denied.* Thus, no deference is given to the trial court's judgment. *Foreman v. Jongkind Bros., Inc.* (1993), Ind.App., 625 N.E.2d 463, 467, *reh'g denied.* Summary judgment is appropriate if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. T.R. 56(C). When reviewing cross motions for summary judgment, the inquiry remains the same: Whether a genuine issue of material fact exists which requires resolution by the trier of fact. *American Family Mut. Ins.*, 634 N.E.2d at 846. When the parties do not dispute the facts material to the claim, our task is to determine whether the trial court correctly applied the law to the undisputed facts. *O'Neal v. Throop* (1992), Ind.App., 596 N.E.2d 984, 986, *trans. denied.*

## DISCUSSION AND DECISION

### I. Indiana's Anti–Gambling Laws

■ We first consider whether the trial court was correct in concluding that L.E. Services' proposed activities were violative of Indiana's anti-gambling laws. Historically, Indiana has strictly prohibited gambling. With the exception of lotteries conducted by the State Lottery Commission, lotteries are

---

1. Counts I, II and III were brought for injunctive purposes only and did not seek an award of general damages for violations of criminal stat-

utes. However, Count VIII was brought for civil damages for the violation of an anti-racketeering criminal statute.

considered illegal gambling in Indiana. I.C. 35–45–5–6 (1993 Supp.); *Lashbrook v. State* (1990), Ind.App., 550 N.E.2d 772, 776 n. 6 (prohibition on lotteries deleted from the Indiana Constitution following voter approval of the amendment in the 1988 general election). The Lottery Commission contends that although Indiana made gambling legal in 1988 as to the State operated lottery,[2] this does not alter the historic prohibition of gambling and Indiana's anti-gambling laws. The Commission contends that offering lottery tickets for sale to Indiana citizens for profit is clearly proscribed activity under Indiana's anti-gambling laws. After considering the arguments of counsel and the relevant statutory authority, we have no hesitation in concluding that L.E. Services' proposed activities are strictly prohibited by Indiana anti-gambling laws. It is clear that Indiana's statutory scheme is to create and maintain state regulated control over all lotteries conducted in this State.

### A. Professional Gambling I.C. 35–45–5–3

■ The trial court granted summary judgment as to Count I of the Lottery Commission's complaint. The Commission alleged in Count I that L.E. Services' proposed operation was violative of Indiana's statutory prohibition against professional gambling. The trial court agreed and concluded that L.E. Services' proposed activities violated subsections (4) and (6) of Indiana's prohibition against professional gambling. That statute provides, in pertinent part, as follows:

A person who knowingly or intentionally:

(4) conducts lotteries, gift enterprises, or policy or numbers games, or sells chances therein; [or]

(6) accepts, or offers to accept, for profit, money or other property risked in gambling;

commits professional gambling, a Class D felony.

I.C. 35–45–5–3. The elements of a violation of subsection (6) are that a person must (1) knowingly or intentionally, (2) accept, or offer to accept, (3) for profit, (4) money risked in gambling. As evidenced by the undisputed facts, L.E. Services proposed to accept or offer to accept money from Indiana residents that would be risked in gambling in out-of-state lotteries. L.E. Services intended to provide this service for a "service charge." "Profit" is defined in the statute as a "realized or unrealized benefit (other than a gain) and includes benefits from proprietorship or management and unequal advantage in a series of transactions." I.C. 35–45–5–1 (1988). Thus, the trial court reasoned that the fact that L.E. Services' fee was not derived from gambling proceeds was irrelevant. We agree.

L.E. Services relies greatly on *Kaszuba v. Zientara* (1987), Ind., 506 N.E.2d 1, *reh'g denied*, for the proposition that "[a]n agreement for [L.E. Services] to act as the attorney in fact for an Indiana resident to effectuate the 'future' purchase of legal lottery tickets through and in their state of issuance is not illegal." Appellant's Brief at 11. We agree with the trial court that "the *Kaszuba* decision in no way authorizes [L.E. Services'] intended activities and its reliance on that case is misplaced." (R. 521).

*Kaszuba* involved one Indiana resident purchasing an Illinois lottery ticket for a second Indiana resident. This transaction consisted basically of a favor for a friend and involved no "profit" aspect, and thus is factually inapposite to the facts before us. Zientara gave his friend and co-worker an envelope containing the exact purchase price of the ticket and his number selections, and Zientara went to Illinois and purchased the ticket.

On transfer, our supreme court concluded that an Indiana agreement to purchase an Illinois lottery ticket, in Illinois, is a legal and enforceable agreement. The court considered I.C. 35–45–5–2 which criminalizes gambling, and remains effective today.[3] (Although *Kaszuba* was decided before Indiana amended its Constitution to permit lotteries, the relevant statutory scheme remains unchanged. Except of course, the Lottery

---

2. Only the Indiana State Lottery authorized by I.C. 4–30–1–1 *et seq.* is permitted.

3. A person who knowingly or intentionally engages in gambling commits unlawful gambling, a Class B misdemeanor. I.C. 35–45–5–2.

Commission is exempted from the statutory prohibitions). The court recognized that under the then-existing Indiana law, the purchase of any lottery ticket was illegal in Indiana. However, it said that the case did not involve the purchase of a lottery ticket in Indiana, but rather it was to "effectuate the purchase of an Illinois Lotto ticket in Illinois." *Kaszuba*, 506 N.E.2d at 2.

Essentially, the *Kaszuba* court said that there is nothing which prohibits an Indiana resident from *possessing* a lottery ticket within Indiana. L.E. Services argues that its proposed agreement is not for the purchase of a lottery ticket in Indiana, but to effectuate the purchase of out-of-state tickets in the other jurisdictions. L.E. Services attempts to twist the language of the statute to its benefit and argue semantics to change the meaning of the statute. In our opinion, *Kaszuba* merely holds that one Indiana resident may travel to Illinois and purchase an Illinois lottery ticket for a second Indiana resident as a favor. *Id.* The holding does not aid L.E. Services with its assertion that the sale of out-of-state lottery tickets in Indiana *for profit* is legal.

L.E. Services' argument that its activity of merely effectuating bets for Indiana residents falls outside the prohibition of the statute is unavailing. By accepting, or offering to accept, money from Indiana residents for the purchase of out-of-state lottery tickets, and by profiting from that activity, L.E. Services violates subsection (6) of Indiana's prohibition against professional gambling.

■ Subsection (4) of the statute prohibits a person from "conduct[ing] lotteries, gift enterprises, or policy or numbers games, or sell[ing] chances therein." I.C. 35–45–5–3(4). L.E. Services claims that the statute is inapplicable because its proposal contemplates a legal order entry service to Indiana residents, and that it is not actually selling tickets. Again, we find L.E. Services' attempt to argue semantics to change the meaning and clear intent of the statute unpersuasive. No matter how L.E. Services attempts to characterize its intended operation, and where the sale actually occurs, L.E. Services intends to assist in the sale of lottery tickets in Indiana. Clearly, L.E. Services' proposed

activities violate subsection (4) of the statute prohibiting professional gambling.

The trial court correctly granted summary judgment in favor of the Lottery Commission on Count I of its complaint.

### B. Promoting Professional Gambling I.C. 35–45–5–4

■ The trial court granted summary judgment as to Count II of the Lottery Commission's complaint. The Commission alleged in Count II that L.E. Services' proposed operation was violative of Indiana's statutory prohibition of promoting professional gambling. The relevant portion of the statute provides as follows:

... [A] person who:

(1) knowingly or intentionally owns, manufactures, possesses, buys, sells, rents, leases, repairs, or transports a gambling device, or offers or solicits an interest in a gambling device

(2) before a race, game, contest, or event on which gambling may be conducted, knowingly or intentionally transmits or receives gambling information by any means, or knowingly or intentionally installs or maintains equipment for the transmission or receipt of gambling information ...

commits promoting professional gambling, a Class D felony.

I.C. 35–45–5–4. The trial court concluded that L.E. Services' proposed activities violated subsections (1) and (2) of Indiana's prohibition against professional gambling in that

(1) [L.E. Services] will install or cause to be installed various pieces of equipment, including computers, computer programs, dedicated phone lines, modems, and [its] own licensed software program, for the purpose of furthering [its] goal of accepting or offering to accept, for profit, money that will be risked in gambling; (2) [L.E. Services] intend[s] to transmit and receive information related to [its] goal of accepting or offering to accept, for profit, money that will be risked in gambling; and, (3) [L.E. Services] intend[s] to install or main-

tain equipment for the transmission and receipt of that information.

(R. 523–24).

L.E. Services' arguments on this issue are all contingent upon the assumption that its activity does not constitute illegal gambling. This assumption is misguided because we have previously concluded that its proposed activity constitutes illegal professional gambling.

Paragraph 3(C) of the stipulation of facts provides that

> Pursuant to the Service Outlet Agreement, the Service Outlet would use a computer system with a modem. L.E. Services would charge the Service Outlet a one time software license user fee and operational set up fee of $495.00. . . .

(R. 117). A list of the necessary hardware and software was attached. The Service Outlet Agreement expressly provides that the Outlet must use only L.E. Services approved computer hardware businesses and support service. Furthermore, the Agreement provides that L.E. Services

> order/entry software is the property of L.E. Services, Inc., and Service Outlet is expressly forbidden to copy, sell, or tamper with software. Upon termination of this Agreement, all Company software, forms, documentation, promotional material, displays, signs, supplies or other data or material supplied shall be immediately returned to L.E. Services, Inc. and Service Outlet shall not make use of or retain any copies thereof.

(R. 126).

■ A gambling device is "a mechanism, furniture, fixture, construction, or installation designed primarily for use in connection with professional gambling." I.C. 35–45–5–1. L.E. Services argues that the trial court relied on facts not in evidence in concluding that L.E. Services possessed equipment designed *primarily* for gambling. (emphasis in Appellant's Brief). We disagree. There is adequate information contained in the stipulation of facts, and specifically in the Service Outlet Agreement, to permit the trial court to discern that L.E. Services (1) directed the service outlets to purchase specific types of hardware and software; (2) mandated that the service outlet could only use L.E. Services approved hardware and business support services; (3) charged the service outlet a software license user fee to obtain the necessary software; (4) possessed, and intended to offer to sell or lease a "Lottery Express Services order/entry software" package.

L.E. Services further argues that its plan did not contemplate the transmission of illegal gambling information. Gambling information means "a communication with respect to a wager made in the course of professional gambling" or "information intended to be used for professional gambling." I.C. 35–45–5–1. At the very least, L.E. Services intends to transmit information between itself and its agents in the issuing states. Specifically, it intends to transmit the details of the Service Outlet's customer orders, such as, name of customer, state of issuance, ticket numbers, date of lottery and amount of order. Because we have already determined that L.E. Services' proposed activities would constitute professional gambling, it does not require a huge mental leap to conclude that the devices to be used in its gambling enterprise are gambling devices.

The trial court correctly granted summary judgment in favor of the Lottery Commission on Count II of its complaint.

C. Unlawful Gambling I.C. 35–45–5–2

■ The trial court granted summary judgment in favor of the Lottery Commission on Count III of the Commission's complaint. Count III of the Commission's complaint alleged that L.E. Services' proposed plan was violative of Indiana's statutory prohibition against unlawful gambling. "A person who knowingly or intentionally engages in gambling commits unlawful gambling, a Class B misdemeanor." I.C. 35–45–5–2. The stipulation of facts and appendices thereto provide sufficient information from which the trial court could conclude that L.E. Services' intended activities involved the sale or purchase of lottery tickets. 35–45–5–1 defines gambling as "risking money or other property for gain, contingent in whole or in part upon lot, chance, or the operation of a gambling device."

L.E. Services attempts to feign compliance with the laws of this State by including language such as the following in its Service Outlet Contract:

> L.E. Services, Inc. does NOT sell lottery tickets nor are they authorized representatives of any state agents or state lotteries. L.E. Services, Inc. is an Order Entry Service/Courier Service and must be presented to the public as such. It is expressly forbidden by this Agreement for Service Outlet to represent itself or the Company as a seller of lottery tickets.

(R. 125). Despite L.E. Services' attempt to tailor its business purpose to fit within the constraints of the law, it cannot change the fact that it proposes to accept, or offer to accept, for profit, money to be risked in gambling. And thus, its activities constitute illegal gambling.

L.E. Services further argues that it expressly states on its order receipt that "[L.E. Services] or the outlet representative shall have no risk, stake, share or ownership interest in [the customer's] order. All risk, gamble, chance, wager and payoff is between [the customer] and the originator of the product, the state's issuing authority." (R. 128). This, again, is a futile attempt by L.E. Services to bring itself outside of the confines of the prohibition.

The trial court correctly granted summary judgment as to Count III of the Lottery Commission's complaint.[4]

### D. Aiding and Abetting Violations

L.E. Services contends that the trial court erred in finding that its activities constituted aiding and abetting or attempting the commission of the anti-gambling statutes. Specifically, L.E. Services argues that the trial court erred in denying its motion to strike the aiding and abetting violations because they were not raised in the Commission's complaint.

The relevant trial rule regarding motions to strike provides that "[u]pon motion by a party ... the court may order stricken from any pleading any insufficient claim or defense or any redundant, immaterial, impertinent, or scandalous matter." T.R. 12(F). We disagree with L.E. Services' contention that the disputed allegations were not raised in the Commission's initial complaint. *See Thacker v. State* (1990), Ind., 556 N.E.2d 1315, 1322 ("Aiding, inducing or causing an offense is not a separate offense under I.C. 35–41–2–4 ...."). The trial court said in its final order on summary judgment that "[t]he many steps set forth in the Stipulation of Facts that [L.E. Services] intend[s] to take in Indiana serve to form the necessary factual basis for accessory liability." (R. 521). We agree with the trial court and find that it properly denied L.E. Services motion to strike. We further find that the trial court correctly granted summary judgment on the Aiding and Abetting violations.

### II. Indiana Civil Remedies for Racketeering Activity (CRRA)
### I.C. 34–4–30.5–1 *et seq.*

The trial court granted summary judgment as to Count VIII of the Commission's complaint, finding that because L.E. Services' proposed activities are violative of Indiana's prohibition against promoting professional gambling, they also violate the CRRA. In Count VIII, the Lottery Commission sought treble damages and to enjoin L.E. Services from further implementing its plan.

Indiana's Racketeer Influenced and Corrupt Organizations Act provides in relevant part that "a person ... who is employed

---

4. Abundant persuasive authority demonstrates that the anti-gambling laws of others states have been successfully invoked to enjoin business practices like L.E. Services'. *See e.g. New Jersey v. Fiola*, 242 N.J.Super. 240, 576 A.2d 338 (A.D. 1990) (permanent injunction issued enjoining similar illegal business proposal in New Jersey); *People v. Kim*, 154 Misc.2d 346, 585 N.Y.S.2d 310 (1992) (New York court held that selling out-of-state lottery tickets in New York violates New York anti-gambling laws, and statutory requirement that lottery be specifically authorized by New York law); *People v. Rhee* No. 91–1545–01 [Sup.Ct. filed March 27, 1992] (purchasing service for out-of-state lottery tickets held to violate New York's anti-gambling statutes). Massachusetts, Nebraska, Michigan, Oregon and West Virginia have also indicated, via Attorney General correspondence/informal answers to inquiries, their objection to such business practices. Similar order entry service proposals existed in each of these cases. This list of persuasive authority is for illustrative purposes only and in no way purports to be exhaustive.

by or associated with an enterprise, and who knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity ... commits corrupt business influence, a Class C felony." I.C. 35–45–6–2(3) (1993 Supp.). Racketeering activity means to commit, to attempt to commit, to conspire to commit a violation of, or aiding and abetting in a violation of [any of the predicate offenses listed in 35–45–6–1(1)–(29) ]. I.C. 35–45–6–1 (1994). Among the predicate offenses is promoting professional gambling. I.C. 35–45–6–1(24).

The trial court found that each of the elements necessary to prove the crime of corrupt business influence could be established by the undisputed facts. We agree. The individual defendants, Neil and Virginia Bonyor are "associated" with L.E. Services; they knowingly and intentionally have participated in the activity of their business; and they did this through a pattern of racketeering activity, namely promoting professional gambling.

■ L.E. Services contends that the Commission is not an aggrieved party within the meaning of the CRRA, that the Commission has not been harmed and that L.E. Services has not engaged in corrupt business influence. I.C. 34–4–30.5–5 provides that an aggrieved party may bring an action against a corrupt business influence for injunctive relief and treble damages (1993 Supp.). Pursuant to the CRRA an aggrieved person is a person who has an interest in property or in an enterprise that either is the object of corrupt business influence or has suffered damages or harm as a result of corrupt business influence. 34–4–30.5–1(1). The Commission is charged by statute to maintain the integrity and dignity of the Hoosier Lottery. Moreover, the security division of the Commission is charged with the responsibility of investigating violations of the lottery rules and taking the steps necessary to ensure the security and integrity of the operation of the lottery. The undisputed facts, as stipulated by the parties, sufficiently establish the Commission as an aggrieved party within the meaning of the CRRA.

■ Next, L.E. Services contends that its business was not fully operational at the time of summary judgment, and therefore it did not engage in corrupt business influence. Again, these repeated efforts to avoid summary judgment on these grounds are futile. The purpose for cross-motions for summary judgment and the stipulation of facts was for the trial court to determine the legality of L.E. Services' proposed enterprise. Whether the enterprise was fully operational or still in the organizational phase is irrelevant for purposes of this appeal.

The undisputed facts, as stipulated by the parties, were sufficient to satisfy every element of corrupt business influence. The trial court correctly granted summary judgment on Count VIII in favor of the Lottery Commission.

### III. Constitutionality of Indiana's Anti–Gambling Statutes

In an additional attempt to avoid the prohibitions of Indiana's anti-gambling statutes, L.E. Services argues that the statutes are unconstitutional on several grounds. L.E. Services argues that the legislation is violative of (a) the Commerce Clause; (b) federal anti-trust laws; (c) free speech; and (d) the Contract Clause. The trial court found each of the challenged statutes to be constitutional.

### A. The Commerce Clause

■ L.E. Services alleges that the Indiana statutes are in violation of the Commerce Clause because their purpose and design amount to economic protectionism, i.e. by treating the purchase of other states lottery tickets differently than the purchase of Indiana lottery tickets.[5]

■ The Commerce Clause and the Necessary and Proper Clause when read together grant Congress the power to regulate commerce among foreign nations and among the several states, and to make all laws necessary and proper for carrying into execution

---

**5.** Economic protectionism has been defined as regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. *See New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988).

the specific legislative powers granted by the Commerce Clause or any other part of the Constitution. U.S.CONST. art. I, § 8, cl. 3 & 18. The Necessary and Proper Clause enhances congressional power over commerce making it plenary.

■ There are two major functions of the Commerce Clause. One is a limitation on state legislative power to regulate under the implied negative theory (commonly called the "dormant Commerce Clause"). *South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984). The other is defining the scope of federal power to regulate commerce. *Id.* The objective behind restrictions on state regulation of interstate commerce is the premise that commerce should flow freely between the states, thus making the nation one economic unit.

■ We first make the threshold determination that lottery tickets are the subjects of commerce insofar as the carriage of such tickets from one state to another is interstate commerce which Congress may prohibit. *Champion v. Ames*, 188 U.S. 321, 354, 23 S.Ct. 321, 326, 47 L.Ed. 492 (1903) (Supreme Court reviewed the constitutionality of legislation which prohibited the interstate transportation of lottery tickets and held that the Commerce Clause empowers Congress to prohibit lottery tickets in interstate commerce).

■ L.E. Services argues that the Indiana statutes violate the dormant Commerce Clause. When state regulation is challenged under the dormant Commerce Clause, the regulation is subjected to one of two tests, depending upon the discriminatory nature of the statute. The elevated scrutiny test applies when a statute is discriminatory on its face or in its practical effect. The commonly called "*Pike* test" is applied where the regulation "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

■ First, we do not believe that traditional Commerce Clause analysis is the proper vehicle to resolve this case. Because Congress has expressly sanctioned the states' authority to regulate gambling activities within their respective borders, the dormant Commerce Clause has become inapplicable. Congress has expressly criminalized the exact activity that L.E. Services proposes.

On September 13, 1994, the Violent Crime Control and Law Enforcement Act of 1994, went into effect, including an amendment to the Federal Interstate Wagering Statute. Pub.L.No. 103–322. The relevant portion of the statute reads as follows:

> Whoever ... being engaged in the business of procuring for a person in 1 State such a ticket, chance, share, or interest in a lottery, gift, enterprise or similar scheme conducted by another State (unless that business is permitted under an agreement between the States in question or appropriate authorities of those States), knowingly transmits in interstate or foreign commerce information to be used for the purpose of procuring such a ticket, chance, share, or interest; ... shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1301. This federal statute prohibits and imposes criminal fines for the exact activity which L.E. Services attempts to do.

■ Congressional power is plenary and far exceeds the regulatory power possessed by the individual states in the area of interstate commerce. When Congress acts, we indulge in the presumption of constitutionality and proper legislative motive. Of course "when Congress acts, all segments of the Country are represented, and there is significantly less danger that one State will be in a position to exploit others." *South–Central Timber Dev., Inc.*, 467 U.S. at 92, 104 S.Ct. at 2243. Thus, Congress has indicated its willingness and clear intent to assist the several states in the prohibition of interstate lottery operations. *See U.S. v. Fabrizio*, 385 U.S. 263, 269, 87 S.Ct. 457, 460–61, 17 L.Ed.2d 351 (1966) (Supreme Court clearly articulated that one of the principal purposes of 18 U.S.C. § 1953 [which prohibits the interstate carriage of gaming tickets, para-

phernalia, etc. . .], was to aid the States "in the suppression of gambling where such gambling is contrary to state policy"). Indiana's additional statutory authority exempting Commission-approved lotteries simply furthers the clear congressional intent to prohibit interstate traffic of lottery tickets. *See* I.C. 4–30–18–1 (1989); I.C. 4–30–18–4 (1989).

■■■ Once Congress has acted, not only is a dormant Commerce Clause analysis of state regulation improper, but judicial review is precluded. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 154–55, 102 S.Ct. 894, 910–11, 71 L.Ed.2d 21 (1982) ("Once Congress acts, courts are not free to review state taxes or other regulations under the dormant Commerce Clause. When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action. Courts are final arbiters under the Commerce Clause only when Congress has not acted." (citations omitted.)); *See also South–Central Timber Dev., Inc.*, 467 U.S. 82, 88, 104 S.Ct. 2237, 2240–41, 81 L.Ed.2d 71 (for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear. Express congressional authorization is not always necessary. If federal policy is clearly delineated, a state may adopt a similar policy without explicit congressional approval). § 1301 is no less than an affirmative expression of approval of Indiana's parallel policy. We find that the 1994 amendment to § 1301 was carefully tailored to prohibit the exact activity that L.E. Services proposes to engage in.

L.E. Services relies heavily on the U.S. District Court decision for the Middle District of Pennsylvania in *Pic–A–State Pa., Inc. v. Commonwealth of Pennsylvania*, D.C.Civ. No. 93–CV–00814, 1993 WL 325539 (M.D.Pa.). That case held that a Pennsylvania statute which prohibited the sale of out-of-state lottery tickets was unconstitutional under the Commerce Clause. However, the Third Circuit recently reversed the decision of the district court. *Pic–A–State Pa., Inc. v. Commonwealth of Pennsylvania*, 42 F.3d 175 (3d Cir. (Pa.) 1994). The Third Circuit acknowledged that the 1994 Crime Control Act makes the conduct of a business that sells an interest in another state's lottery a federal crime. *Id.* The court then upheld the constitutionality of the Pennsylvania statute under the Commerce Clause. *Id.*

Pic–A–State, like L.E. Services, was engaged in the business of an order entry lottery service for the sale of out-of-state lottery tickets. The Third Circuit found that the Pennsylvania statute proscribes the sale within Pennsylvania of an interest in another state's lottery, and as such is consistent with the 1994 Crime Control Act. *Id.* Thus, because the Pennsylvania statutory scheme complements the federal statute, the Third Circuit held that the Pennsylvania statute did not violate the dormant Commerce Clause. *Id.* We agree explicitly with the Third Circuit and adopt much of the same reasoning herein.

Furthermore, Indiana's statutory scheme prohibits all lotteries, except the lottery operated by the Commission or any lottery authorized by the Commission. I.C. 4–30–18–1 (provides that "this article does not authorize any lottery except the lottery operated by the Commission under this article."); I.C. 4–30–18–4 (exempts from the application of Indiana's anti-gambling laws the sale of any lottery tickets authorized by the Commission). Thus, even if we were to apply the *Pike* test to the regulatory scheme, it clearly regulates in-state and out-of-state activities even-handedly. *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. Indiana's regulatory scheme would survive judicial scrutiny under the dormant Commerce Clause. We do not believe Indiana's approach favors in-state interests over out-of-state interests. The key is whether lottery tickets are being sold for profit and without the Commission's authority. Although we recognize the argument that Indiana's objective is to promote the economic interests of its own citizens, we hold that the regulatory scheme is not an act of economic protectionist legislation and is not motivated by discriminatory purposes. The states may regulate lottery activity with-

in their own borders, and any indirect impact on interstate commerce is merely incidental.

We have looked to other states' handling of this issue for guidance. Florida, Connecticut, Ohio and West Virginia courts have found that statutory regulations such as Indiana's do not offend the Commerce Clause. *See Winshare Club of Canada v. Department of Legal Affairs* (1989), Fla., 542 So.2d 974 (Florida supreme court held that Florida statute prohibiting the sale of out-of-state lottery tickets did not violate the Commerce Clause under the deferential low-level scrutiny standard); *State v. Ader,* 1992 WL 119194 (Conn.Super.1992) (Connecticut court held that Connecticut statute that criminalized the sale of out-of-state lottery tickets in Connecticut is constitutionally sound because Congressional enactments on the interstate sales of lottery tickets contemplate that the states may regulate purely internal lottery ticket sales); *State of Ohio v. Out-of-State Lotto Network, Inc.,* Court of Common Pleas, Franklin County, Cause No. 94CVH–03–1914 (July 20, 1994), (under statutory scheme similar to Indiana's, court held that similar business plan should be enjoined, and further held that Ohio's statutory scheme did not violate the Commerce Clause); *State of West Virginia, et al. v. Out-of-state Lotto Network, Inc.,* Kanawha Circuit Court, Cause No. 94–C–681 (August 9, 1994) (West Virginia court held that under its constitutional and statutory scheme which prohibits lottery activities other than the legally operated West Virginia Lottery, business of selling out-of-state tickets within West Virginia is illegal and statutes do not violate the Commerce Clause because State's action was specifically authorized by Congress). Each of these cases held that Congress has authorized the states to regulate all lottery activities within their own borders, and thus that the Commerce Clause is inapplicable to state regulation of lottery activity.

Indiana's regulatory scheme is in harmony with federal policy as expressed in the Violent Crime Control and Law Enforcement Act of 1994, and thus L.E. Services' Commerce Clause attack must fail. Because Congress has clearly consented to State regulation such as exists in Indiana, we find L.E. Services' constitutional attack unavailing.

### B. Federal Anti–Trust

L.E. Services argues that the Commission's attempt to exert monopolistic control over lottery games amounts to a violation of section 1 of the Sherman Act. 15 U.S.C. § 1 et seq. The Sherman Act promotes free and open competition in interstate commerce and prohibits agreements in restraint of trade. L.E. Services does not seek anti-trust damages, but rather seeks to have the Commission's conduct deemed monopolistic and illegal. The trial court held that because Indiana acts as a regulator when legislating, it is exempt from federal anti-trust laws. We agree.

In *Hoover v. Ronwin,* 466 U.S. 558, 568–69, 104 S.Ct. 1989, 1995–96, 80 L.Ed.2d 590 (1984), the Supreme Court held that states and their agencies enjoy the exemption alike. In examining the state-action doctrine, the *Hoover* Court re-affirmed *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker,* the Court considered the anti-trust implications of a California statute that restricted competition among California food producers. Relying on principles of federalism and state sovereignty, the Court concluded that the Sherman Act did not prohibit the anti-competitive actions of a state acting through its legislature. *Parker,* 317 U.S. at 350–51, 63 S.Ct. at 313–14. We find that the doctrine of state-action immunity applies here and thus exempts Indiana from the proscriptions of the Sherman Act.

### C. Free Speech

L.E. Services argues that I.C. 4–30–14–7 violates the First Amendment guarantee of free speech. Essentially, the statute prohibits any entity from using the word "lottery" in its corporate name, without Commission approval. I.C. 4–30–14–7 (1988). Presumably, the legislative intent behind the statute is the protection of Indiana residents from lotteries operating without Commission authority, as here. The trial court held that I.C. 4–30–14–7 represents a regulation of commercial speech and therefore is not entitled to full First Amendment protection.

The First Amendment protects freedom of speech and of the press and the right to peaceably assemble. While commercial speech is subject to a watered down First Amendment protection, it is not totally unprotected speech. Commercial speech may be prohibited if it is deceptive or if it counsels illegal action. *Friedman v. Rogers,* 441 U.S. 917, 99 S.Ct. 2018, 60 L.Ed.2d 389 (1979). If not false or deceptive, it may be regulated where a substantial government interest is being promoted by narrowly drawn means. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of N.Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (commercial speech receives a limited form of First Amendment protection so long as it concerns a lawful activity and is not misleading or fraudulent). In *Posadas De-Puerto Rico Ass'n v. Tourism Co.,* 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986), the Supreme Court held that the content-based statute prohibiting advertising of gambling parlors served the substantial state interest of reducing the demand for casino gambling by Puerto Rican residents and is no more extensive than necessary. *Id.*

We find that the State's interest in regulating gambling activity and protecting its citizens from unlawful gambling far outweighs any commercial speech right L.E. Services may assert. Therefore, we affirm the trial court in its finding that I.C. 4–30–14–7 does not offend the First Amendment's guarantee of free speech. *See U.S. v. Edge Broadcasting Co.,* —— U.S. ——, ——, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993); *Posadas,* 478 U.S. at 341, 106 S.Ct. at 2976–77 ("We have no difficulty in concluding that the Puerto Rico Legislature's interest in the health, safety, and welfare of its citizens constitutes a 'substantial' governmental interest.").

### D. The Contract Clause

Finally, L.E. Services argues that the Commission's attempt to ban its proposed plan is violative of the Contract Clause. *See Texaco v. Short,* 454 U.S. 516, 531, 102 S.Ct. 781, 793, 70 L.Ed.2d 738 (1982) (Contract Clause is triggered when the state enacts legislation which interferes with a pre-existing contract). Because the legislation at issue was enacted well before any contracts L.E. Services may have entered into, the Contract Clause does not apply. Indiana's statutory scheme cannot be said to impair a contract that did not exist at the time of its enactment.

### IV. Proper Designation under T.R. 56

L.E. Services contends that the Lottery Commission failed to properly designate materials as required by T.R. 56(C). The manner in which the parties to a motion for summary judgment are to designate evidentiary material is not mandated by the rule. We have recently revisited the amendments to T.R. 56 effective January 1, 1991, and subsequent discussions of the designation issue by our court. In *Nat'l Bd. of Examiners for Osteopathic Physicians and Surgeons, Inc. v. American Osteopathic Ass'n,* 645 N.E.2d 608, (1994), Ind.App., after recognizing that there exists a lack of consensus among the bench and bar regarding the proper designation of evidentiary materials, we concluded that

> ... how a party is to specifically designate material is not mandated by the rule. Whether the parties designate to the court in the summary judgment motion itself, in a separate filing which designates the material, or in a brief in support (or in opposition to) the motion is within their discretion. As long as the trial court is apprised of the *specific material* upon which the parties rely in support of or in opposition to a motion for summary judgment, then the material may be considered.

645 N.E.2d at 615 (emphasis in original).

Pursuant to the trial court's order, L.E. Services and the Lottery Commission jointly submitted a stipulation of facts expressly for the purpose of summary judgment. The Lottery Commission also clearly stated in its memorandum of law in support of summary judgment that the material upon which it relied was set forth in the joint stipulation of facts. (R. 135). Further, the trial court stated in its entry that it relied exclusively on the joint stipulation of facts. Thus, the trial court was sufficiently apprised of the material upon which the Commission relied.

### V.  Injunctive Relief

L.E. Services contends that the trial court improperly granted injunctive relief because the Commission failed to make a showing of irreparable harm.  Generally the trial court considers four factors in determining the propriety of injunctive relief: (1) whether plaintiff's remedies at law are inadequate, thus causing irreparable harm pending resolution of the action; (2) whether plaintiff can demonstrate a reasonable likelihood of success on the merits; (3) whether threatened injury to the plaintiff outweighs the threatened harm the grant of relief would occasion upon the defendant; (4) whether the public interest would be disserved by granting relief.  *Carson v. Ross* (1987), Ind.App., 509 N.E.2d 239, 241 n. 1, *trans. denied.* However, when the acts sought to be enjoined are unlawful, the plaintiff need not make a showing of irreparable harm or a balance of the hardship in his favor.  *Id.* The granting or denial of a preliminary injunction rests within the trial court's equitable discretion and we will reverse only if the trial court's action constitutes a clear abuse of discretion.  *College Life Ins. Co. of America v. Austin* (1984), Ind.App., 466 N.E.2d 738, 742.

Therefore, because L.E. Services' proposed activities are violative of valid Indiana statutes and because we find no abuse of discretion, we affirm the trial court's grant of injunctive relief.

### CONCLUSION

The trial court correctly concluded that L.E. Services' proposed business plan was violative of Indiana's anti-gambling statutes.  Further, Indiana's regulatory scheme survives judicial scrutiny under the Commerce Clause, the Sherman Anti–Trust Act, and the First Amendment.  The trial court is affirmed in all respects.

DARDEN, J., concurs.

CHEZEM, J., concurs in result without opinion.