Steve **MILLER** and Linda Miller, Husband and Wife, and Charles Miller and Barbara Miller, Husband and Wife, and Charles and Barbara Miller, Trustees of the Charles Hardy and Barbara Miller Family Trust, and Howard Creasey and Patsy Creasey, Husband and Wife, Appellants,

v.

Becky R. **WEBER** a/k/a Becky R. Corn a/k/a Becky R. Bates and W.W. Rentals, Inc., Appellees.

No. 26A05–0507–CV–387.

Court of Appeals of Indiana.

Dec. 16, 2005.

L. Matthew Nixon, Fair, Nixon & Nixon, Princeton, for Appellants.

Verner P. Partenheimer, Hall, Partenheimer & Kinkle, Princeton, for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Steve Miller; Linda Miller; Charles Miller; Barbara Miller; Charles Miller and Barbara Miller, Trustees of the Charles Hardy and Barbara Miller Family Trusts; Howard Creasey; and Patsy Creasey (collectively "the Millers") appeal from the trial court's entry of summary judgment in favor of Becky R. Weber, a/k/a Becky R. Corn, a/k/a Becky R. Bates, and W.W. Rentals, Inc. (collectively "Weber"), in the Millers' quiet title and slander of title action against Weber. The Millers raise three issues for review, which we consolidate and restate as:

1. Whether Weber's interest in minerals underlying the Millers' properties has lapsed under the Indiana Dormant Mineral Act.

2. Whether Weber's deed conveying her interest in minerals underlying the Millers' properties was a slander of title.

We reverse and remand.

## FACTS AND PROCEDURAL HISTORY.

In 1971, Irene Bates Laros owned 100 acres in Gibson County and executed a coal lease in favor of Consolidation Coal Company. From 1971 through 1989, the coal company annually paid advance royalties to Laros, and Laros paid federal and state capital gains taxes on those royalties. In April 1974, Laros conveyed ninety-nine acres to Howard and Patsy Creasey ("the Creaseys") but reserved an interest in the coal underlying the property (the "coal reservation"). The Creaseys and their successors, to whom the Creaseys conveyed part of the ninety-nine acres at issue, are surface owners.

No coal was produced from the mineral interest during the relevant period. Consolidation's assignee terminated an amended lease with Laros in October 1990. In 1992, Laros conveyed the coal reservation to her daughter, Becky R. Corn, a/k/a Becky R. Weber, a/k/a Becky R. Bates ("Weber"). In 2002, Weber quitclaimed the mineral interest to W.W. Rentals, Inc. The Millers, believing that the mineral interest had reverted to them in 1994, have attempted to lease the mineral interest for mining, but the potential lessee has refused to execute a lease until the parties resolve the competing claims of ownership.

The Millers filed an amended complaint to quiet title to the mineral interest underlying their respective properties and alleged a slander of title. Weber filed a motion for summary judgment, and the Millers also filed a motion for summary judgment. The trial court entered special findings and an order, which granted summary judgment on the amended complaint to Weber. The court held that "[t]he payment of income taxes and/or capital gains taxes on advance royalties received constituted a use under I.C. 32–23–10–3(a)(6)" and that "[t]he 20[-]year dormancy period

of the Dormant Mineral Act did not commence to run until Irene Bates Laros or her successors ceased paying taxes attributable to the royalty payments in 1989." Appellant's App. at 11–12. As a result, the trial court concluded that Laros' interest had not lapsed or reverted to the Millers. The Millers appeal.

## DISCUSSION AND DECISION

### Standard of Review

When reviewing summary judgment, this court views the same matters and issues that were before the trial court and follows the same process. *Estate of Taylor ex rel. Taylor v. Muncie Med. Investors, L.P.,* 727 N.E.2d 466, 469 (Ind.Ct. App.2000), *trans. denied.* We construe all facts and reasonable inferences to be drawn from those facts in favor of the nonmoving party. *Jesse v. American Cmty. Mut. Ins. Co.,* 725 N.E.2d 420, 423 (Ind.Ct. App.2000), *trans. denied.* Summary judgment is appropriate when the designated evidence demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). The purpose of summary judgment is to terminate litigation about which there can be no material factual dispute and which can be resolved as a matter of law. *Zawistoski v. Gene B. Glick Co.,* 727 N.E.2d 790, 792 (Ind.Ct.App.2000).

### Issue One: The Indiana Dormant Mineral Act

The Millers contend that Weber's mineral interest lapsed under the Indiana Dormant Mineral Act ("Act"), Indiana Code Sections 32–23–10–1 to –8, and reverted to them in 1994. The Act provides that an interest in coal, "if unused for a period of twenty (20) years, is extinguished and the ownership reverts to the owner of the interest out of which the interest in coal,

oil and gas, and other minerals was carved." Ind.Code § 32–23–10–2. Indiana Code Section 32–23–10–3(a) ("Section 3(a)") lists ways to toll the twenty-year dormancy period and provides in part:

A mineral interest is considered to be used when:

(1) minerals are produced under the mineral interest; [or]

\* \* \* \* \* \*

(3) rentals or royalties are paid by the owner of the mineral interest for the purpose of delaying or enjoying the use or exercise of the rights; [or]

\* \* \* \* \* \*

(6) taxes are paid on the mineral interest by the owner of the mineral interest.

And, when there is no use as defined under Section 3(a), no reversion occurs if a statement of claim is filed within the twenty-year dormancy period. Ind.Code § 32–23–10–2.[1]

The Millers contend that neither the coal company's payment of advance royalties nor Laros' payment of capital gains taxes constitute a "use" as defined in Section 3(a) that would preserve Laros' mineral interest. They further contend that the twenty-year dormancy period began on April 10, 1974, when the mineral interest was created by Laros' conveyance of ninety-nine acres to the Millers and her coal reservation in that deed. Thus, they maintain that the mineral interest at issue lapsed twenty years later, on April 10,

1994, and reverted to them. We must agree.

### 1. Mineral Interests Created under the Dormant Mineral Act

Under the Act, a " 'mineral interest' is an interest that is created by an instrument that transfers, by (1) grant, (2) assignment, (3) reservation, or (4) otherwise an interest in coal, oil and gas, and other minerals." Ind.Code § 32–23–10–1 ("Section 1"). When Laros conveyed title to ninety-nine acres to the Creaseys in 1974, she reserved an interest in the coal underlying that property. Thus, Laros' mineral interest was created in her 1974 deed to the Creaseys. See Ind.Code § 32–23–10–1.

■ But Laros' interest was not the only interest created under the Act. A mineral interest in the same coal had previously been created in 1971 when Laros entered into a lease with Consolidation. See Begley v. Peabody Coal Co., 978 F.Supp. 861 (S.D.Ind.1997) (holding that the Act applies to a lessee's mineral interest and, thus, a mineral interest can be created in a lease). That severance of mineral rights from the fee simple interest in the land created Consolidation's interest in the coal as contemplated under Section 1(4).[2] Thus, under the statute, Laros created two mineral interests: Consolidation's leasehold interest in 1971 and Laros' reserved interest in 1974. In other words, Consolidation and Laros owned separate interests in the same coal. When there are multiple mineral interests in the same property, each interest is independent and is preserved or lapses depending on each

---

**1.** Neither party asserts that Laros or Weber filed a statement of claim pursuant to Indiana Code Section 32–23–10–2.

**2.** Consolidation's interest ended in 1989 when its assignee terminated the lease. There is no

evidence in the record indicating when Consolidation assigned its interest under the lease, but the date and fact of that assignment are immaterial to our analysis.

owner's use of its respective interest.[3]

## 2. Payment of Advance Royalties to Toll Dormancy Period

■ The Millers contend first that the coal company's payment of advance royalties from 1971 to 1989 does not constitute a use under Indiana Code Section 32–23–10–3(a)(3) that preserved Laros' mineral interest. The Millers note that Section 3(a)(3) requires that the *owner* of the mineral interest pay the rents or royalties in order to toll the dormancy period and further contend that Consolidation and its assignee were not owners but were lessees. Therefore, they assert that Consolidation's payment of advance royalties to Laros did not toll the dormancy period as to Laros' mineral interest. We disagree with the Millers to the extent they assert that Consolidation was not an owner, but we agree that the company's payment of royalties to Laros did not toll the dormancy period on her interest.

The dormancy period is tolled when the "owner" pays rents or royalties in order to delay or enjoy the use of or exercise rights in a mineral interest. Ind.Code § 32–23–10–3(a)(3). Here, there are two interests at issue, Consolidation's interest, which was created in the 1971 lease, and Laros' interest, which was severed from the surface rights through the 1974 deed conveying the surface rights to the Creaseys. Payment of royalties by Consolidation or its assignee preserved its interest. But

Laros paid no rents or royalties in order to "delay[ ] or enjoy[ ] the use or exercise of [ ] rights" in the mineral interest at issue. *See* Ind.Code § 32–23–10–3(a)(3). Under Section 3(a)(3), Consolidation's payment of royalties to Laros did not toll the dormancy period as to Laros' interest.

Still, Weber contends that Consolidation's payment of advance royalties preserved *both* Consolidation's and Laros' mineral interest in the coal. Weber reasons that because the dormancy period was tolled on the coal company's mineral interest by the company's payment of advance royalties, under Section 3(b) "all of Laros' rights in the coal were preserved from dormancy until 1990, [when Consolidation's assignee terminated the lease,] because the Act provides that a qualifying use by the lessee is all that is required to preserve all rights granted by the lease, including those of the lessor." Appellee's Brief at 14. Weber misconstrues the Act.

Section 3(b) of the Act provides that "a use under or authorized by an instrument that creates a mineral interest continues in force all rights granted by the instrument." As noted above, Laros' mineral interest was created in 1974 by the reservation of coal rights in Laros' deed conveying surface rights to the Creaseys. The 1971 lease that created the coal company's mineral interest as contemplated in Section 1 of the Act also gave Laros certain rights.[4] But the lease to Consolidation did

3. *See* Ronald W. Polston, *Legislation, Existing and Proposed, Concerning Marketability of Mineral Titles,* 7 Land and Water Law Review 73 (1972) (discussing the effect of lapse statutes on multiple severed mineral interests in common real property and showing in hypothetical scenarios how some interests may lapse under a proposed model of the Dormant Mineral Act while others in common property continue). The article notes that Polston drafted the Indiana Dormant Mineral Act, although the Act as discussed in the article is

slightly different than the Indiana Act because, when the article went to print, Polston had erroneously been informed that the legislature had not passed the Act. The differences are not material to the issues before us.

4. Weber contends that the lease granted to Laros the following rights: the rights to receive royalties, to have the mining operations conducted in a workmanlike manner, to cancel the lease under certain circumstances, and to regain sole possession of the coal if the

not transfer to Laros by grant, assignment, reservation, or otherwise an interest in the coal that Laros did not already possess prior to execution of the lease. Rather, the lease merely gave Laros the contract right to royalties from Consolidation's exploitation of the mineral interest that the coal company had acquired under the lease.

Prior to severance of the mineral rights through that deed, Laros' interest in the coal was not severed from the surface rights. Thus, at that point, the Act did not yet apply to her. When Laros carved a mineral interest out of the fee simple interest in her 1974 deed to the Creaseys, she created a mineral interest separate from the surface rights, at which time the Act became applicable to her.

Consolidation's payment of advance royalties was a "use" under Section 3(a)(3) that preserved for Laros all rights given to her under the lease. But those rights did not include any right to the coal because Laros' mineral interest did not arise under the lease. Rather, Laros' mineral interest arose under the 1974 deed to the Creaseys, and she did not pay any rents or royalties in order to preserve that interest as contemplated in Section 3(a)(3). As noted above, each mineral interest is preserved or lapses independent of the other. We conclude that Consolidation's payment of royalties did not toll the dormancy period of Laros' mineral interest under Section 3(a)(3).

### 3. Payment of Taxes to Toll Dormancy Period

Indiana Code Section 32–23–10–3(a)(6) ("Section 3(a)(6)") provides for the tolling of the dormancy period when "taxes are paid on the mineral interest by the owner of the mineral interest." The Millers contend that Laros' payment of capital gains taxes on the advance royalty payments does not constitute a use that tolled the dormancy period under the Act. Laros counters that her payment of capital gains taxes on royalties received from the lessee constitutes a tax "paid on the mineral interest" and, therefore, satisfies Section 3(a)(6). We agree with the Millers.

An appellate court must construe a statute according to its plain meaning. *Wayne Township of Allen Cty. v. Hunnicutt*, 549 N.E.2d 1051, 1054 (Ind.Ct.App.1990). Words and phrases shall be taken in their plain, ordinary and usual sense unless a different purpose is manifested by the statute itself. *Id.* And a statute must also be construed to ascertain and give effect to the general intent of the legislature. *Id.* When enacting a statute, the legislature is presumed to be mindful of existing law. *Burke v. Town of Schererville*, 739 N.E.2d 1086, 1092 (Ind.Ct.App.2000), *trans. denied.*

■ The purposes of the Indiana Dormant Mineral Act "are [1] to remedy uncertainties in titles and [2] to facilitate the exploitation of energy sources and other valuable mineral resources." *Short v. Texaco, Inc.*, 273 Ind. 518, 406 N.E.2d 625, 630, 631 (1980), *aff'd*, 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982). The general recording statute, Indiana Code Section 32–1–2–16, requires that deeds conveying real property be recorded. The legislature enacted the general recording statute "to provide protection to subsequent purchasers, lessees, and mortgagees. That is, when multiple parties claim adverse interests in the same land, the date of recording provides a means to

lease were to be released. We note that none of the rights listed is a right to or an interest

in the coal itself.

determine priority among those claims." *Patterson v. Seavoy*, 822 N.E.2d 206, 211 (Ind.Ct.App.2005).

The Act requires active use of a mineral interest in order to preserve that interest, but, in lieu of an active use, it also provides for the tolling of a dormancy period if an owner gives notice of intended use. *See* Ind.Code § 23–23–10–3(a) (listing passive "use[s]" that toll the dormancy period on mineral interests). As noted above, one purpose of any use is to remedy uncertainties in titles to mineral interests. To further that aim, a public record of such interests must be made.

 Only interests that are in the "chain of title" provide a public record to those with potentially competing claims. Describing the concept of "chain of title" to a tract of land, our supreme court has stated:

> In a title search, the prospective purchaser or his abstractor assesses the marketability of title to a tract of land by determining the "chain of title." Beginning with the person who received the grant of land from the United States, the purchaser or abstractor traces the name of the grantor until the conveyance of the tract in question. The particular grantor's name is not searched thereafter. As the process is repeated, the links in the chain of title are forged.

*Bank of N.Y. v. Nally*, 820 N.E.2d 644, 650 (Ind.2005). And the chain of title includes public records from several sources:

> The recorder's office is not the only public office required to maintain records affecting the title to real estate. As such, a complete title search is not confined to the records of the county recorder. Although actual practice may vary somewhat from county to county, an abstractor or title insurance agent will routinely examine records affecting title to real estate in the offices of the recorder, auditor, assessor, treasurer, sheriff and clerk of the courts in the county where the real estate is located.

*WorldCom Network Servs. v. Thompson*, 698 N.E.2d 1233, 1241 (Ind.Ct.App.1998). Thus, the statutory mandate that all deeds, including those conveying mineral interests, be recorded furthers a purpose of the Act by creating a public record of the owners of such interests.

The recording of Laros' deed to the Creaseys provided a public record of the newly created mineral interest that would facilitate the marketability of that interest.[5] Likewise, the payment of real property taxes on a mineral interest facilitates the marketability of title to that interest. When Laros' mineral interest was created, the Indiana Code provided that a severed mineral interest was "real property," *see* Ind.Code § 6–1–20–4 (repealed 1975), and that "real property" was "tangible property," Ind.Code § 6–1–20–6 (repealed 1975). The code further provided that "all tangible property within the jurisdiction of this state on the assessment date shall be subject to assessment and taxation," Ind.Code § 6–1–21–1 (repealed 1975), and directed the county auditor to keep a transfer book, arranged by townships, cites and towns, in which he was to enter a description, for the purpose of taxation, of all lands that had been conveyed by deed or partition, which record was to include the names of the parties to the conveyance, Ind.Code § 6–1–27–8 (repealed 1975). Thus, in 1974, the Indiana Code defined mineral interests as real property subject to taxation and required that the county auditor

---

**5.** Laros' warranty deed to the Creaseys was recorded April 10, 1974.

keep a record of such interests.[6] We must presume that the legislature contemplated that taxes would be assessed and paid on mineral interests when it enacted Section 3(a)(6) of the Act. *See Burke,* 739 N.E.2d at 1092. Thus, property tax records also meet the Act's purposes by facilitating both the marketability of mineral titles and the exploitation of mineral resources.

■ Nevertheless, Weber contends that the payment of capital gains taxes satisfies Section 3(a)(6). Specifically, Weber maintains that the payment of such taxes furthers a purpose of the Act by promoting the exploitation of mineral interests. We agree that the royalties paid under the lease facilitated the exploitation of Consolidation's mineral interest and furthered the exploitation of Laros' mineral interest, but that is not enough. A public record is required to ensure that interest is advanced. Without a public record of an owner's tax payments on a mineral interest, there is no way to track whether that interest is, in fact, active or dormant as contemplated under the Act.

Here, the payment of capital gains taxes did not create a public record of Laros' ownership of the mineral interest. Capital gains taxes are not recorded in any public document but, instead, are found on the recipient's income tax returns, which are not public records. The payment of capital gains taxes on royalties does not appear in the chain of title and, thus, does

nothing to remedy uncertainties in titles to mineral interests.

We note that, in its special findings and order, the trial court determined that during the period in question Gibson County did not specially record or assess local property tax on severed coal interests. Thus, Laros could not satisfy Section 3(a)(6) by paying property taxes on her mineral interest. Nevertheless, that is what Section 3(a)(6) requires in order to toll the dormancy period. But Laros was not prevented from preserving her interest under the Act because she could have filed a statement of claim. *See* Ind.Code § 32–23–10–2. Thus, we conclude that Laros' payment of capital gains taxes on royalties paid under a mineral lease does not constitute a "use" under Section 3(a)(6) of the Act and, therefore, that Laros' payment of capital gains taxes on royalties did not toll the dormancy period of her mineral interest.[7]

### Issue Two: Slander of Title

■ The Millers also asserted a slander of title claim against Weber and for attorney's fees based on the alleged slander of title. To succeed on a claim for slander of title, a plaintiff must prove that false statements were made, with malice, and that the plaintiff sustained pecuniary loss as a necessary and proximate result of the slanderous statements. *Trotter v. Ind. Waste Systems, Inc.,* 632 N.E.2d 1159, 1162 (Ind.Ct.App.1994). The essence of slander of title is the making of an unfounded claim concerning the ownership or

---

**6.** Although recodified, these statutory provisions remain substantially unchanged today. *See* Ind.Code § 6–1.1–1–15 (providing that severed mineral rights constitute "real property" for purposes of the tax code); Ind.Code § 6–1.1–1–19 (defining "tangible property" to include "real property"); Ind.Code § 6–1.1–2–1 (providing that all tangible property within the state's jurisdiction on the assessment date is subject to taxation); Ind.Code § 6–1.1–22–3 (requiring each county's auditor to prepare annually a tax roll that include the

value of the assessed property and the personal liable for taxes on it).

**7.** Although courts in Minnesota have held that royalties paid on a mineral interest constitute real property subject to taxation, *see Minn. v. Royal Mineral Assoc.,* 132 Minn. 232, 156 N.W. 128 (1916); *Marble v. Oliver Mining Co.,* 172 Minn. 263, 215 N.W. 71 (1927), those cases are not binding here.

security interest in property of another, resulting in financial loss to the rightful owner. *Id.*

 To show an unfounded claim concerning ownership of property, the Millers must succeed in their claim under the Act. When the trial court determined in its grant of summary judgment that there was no merit to the Millers' claim under the Act, it did not address their slander of title claim. We have determined that the Millers have established their claim under the Act. Therefore, we must remand to the trial court to address the Millers' claim of slander of title and for attorney's fees.

### Conclusion

Consolidation's payment of royalties to Laros tolled the dormancy period on Consolidation's mineral interest under the lease but did not preserve Laros' mineral interest, which was created in 1974 when she reserved the coal rights incident to the conveyance of surface rights to the Creaseys. And Laros' payment of capital gains taxes on the royalties that she received from Consolidation does not constitute a tax paid on a mineral interest. Laros could have tolled the dormancy period by simply filing a statement of claim as provided in Indiana Code Section 32–23–10–2. Because Laros has shown no use under the Act that would toll the dormancy period on her mineral interest and did not file a statement of claim, her interest lapsed in 1994, twenty years after its creation. Because the Millers have established their claim under the Act, we remand for proceedings on their slander of title claim not inconsistent with this opinion.

We reverse and remand.

BARNES, J., and CRONE, J., concur.